In re METRO PAPER, INC., Debtor.

Robert O. TYLER, Trustee in Bankruptcy, Plaintiff,

v.

CAPITOL CHEMICAL INDUSTRIES, INC., Richard Defranco, Defendants.

Adv. No. 81–0059.

United States Bankruptcy Court, District of Columbia.

Jan. 26, 1982.

Robert O. Tyler, Williams, Myers & Quiggle, Washington, D. C., for plaintiff.

Neal Melnick, Weinstein & Weinstock, Baltimore, Md., for defendants.

## MEMORANDUM OPINION

(Complaint to Avoid Fraudulent Transfer, 11 U.S.C. § 548)

ROGER M. WHELAN, Bankruptcy Judge.

■ This matter came before the Bankruptcy Court for trial hearing on December 10, 1981, as the result of the trustee's complaint alleging fraudulent transfers pursuant to § 548 of the Bankruptcy Code by the named defendants, Capitol Chemical Industries ("CCI") and Richard DeFranco, president and sole stockholder of the defendant, CCI.[1] The trustee's cause of action, predicated on actual as well as implied fraud under 11 U.S.C. § 548, was based on the fact that the debtor, who was once a wholly-owned subsidiary of the defendant CCI, within four months of the date of bankruptcy, transferred substantial sums of money (pursuant to accounting testimony, a total of $278,785.95) to CCI in satisfaction of loan repayments and purchases. These repayments were, according to the trustee in bankruptcy, not based on any actual repayments due, but were in fact a sham. The defendant CCI elected not to adduce any

1. As the result of a motion for involuntary dismissal made pursuant to Bankruptcy Rule 741 by defendant's counsel at the close of the plaintiff-trustee's case, the Court granted the motion solely as to the individual defendant, Richard DeFranco. This was granted in that the only evidence of record establishing any liability on the part of Richard DeFranco, as an individual, was testimony establishing that DeFranco was the principal officer and stockholder of defendant CCI. No evidence as to De-

Franco's individual liability vis-a-vis the alleged fraudulent transfers was in any way established by the trustee in bankruptcy. There is no allegation or proof that the defendant acted other than in the normal course of business on behalf of the corporate defendant, CCI. It is well established that merely naming defendants in their individual capacity is not sufficient to establish their liability separate and apart from that of the corporate entity.

evidence but relied upon the fact, based on oral argument, that the trustee's evidence was insufficient as a matter of law to establish a fraudulent transfer under the Bankruptcy Code. Based on a careful review of the documentary evidence received, and after applying the appropriate standard as to actual fraud, namely one of clear and convincing evidence, the Court concludes that the transfer was fraudulent within the meaning of both 11 U.S.C. § 548(a)(1) and § 548(a)(2).[2]

The facts established that the defendant, CCI, a District of Columbia corporation, was the sole stockholder of Metro Paper prior to April 1, 1980. In March 1980, (although efforts to sell the business were made as early as 1979) an agreement was reached with Hugh E. Robinson, a former salesman of CCI, to buy all of the stock of Metro for the stated consideration of $272,-000.00. An agreement for the sale of stock was entered into on April 1, 1980 (Pl. Ex. # 7), whereby the stock would be sold pursuant to the following terms and conditions:

"Seller shall sell to Purchaser, free from all liabilities and encumbrances, 100 shares of common stock of Metro Paper Co., Inc., representing one hundred percent (100%) of the issued and outstanding shares of said corporation.

.    .    .    .    .

In consideration for the transfer of the above-described shares of stock from the Seller to Purchaser, Purchaser shall pay to Seller the sum of Two Hundred Seventy-Two Thousand Dollars ($272,000.00), which Seller shall accept from Purchaser in full payment therefor, subject to the terms and conditions herein contained.

The purchase price shall be paid as follows

Twenty-Five Thousand Dollars ($25,-000.00) in cash or Certified Check at the time of the execution of this Agreement; and

The balance of Two Hundred Forty-Seven Thousand Dollars ($247,000.00) payable six (6) months from the date of the execution of this Agreement evidenced by a Promissory Note from the Purchaser to the Seller, which Promissory Note shall earn interest at a rate of twelve percent (12%) per annum on the unpaid balance thereof. Further, said Note shall contain no restriction on prepayment of the principal and shall provide further for payment of accrued interest in monthly installments, the first due thirty (30) days from the date of the execution of this Agreement." (Ex. # 7 at 1–2).

The sales price, based on the testimony of Richard DeFranco was arrived at by taking the "net worth of the company" at $180,000 (which the defendant stated was the value of the accounts receivable and inventory (Tr. at 24)) and adding a figure for "good will" based on the nature of an established business; namely, as characterized by the testimony of Richard DeFranco, a "turnkey" operation. DeFranco was neither clear nor certain as to whether CCI ever received any portion of the purchase price, including the $25,000.00 down payment called for by the agreement.

The financial background of Metro and its dealings with its parent company imme-

**2.** 11 U.S.C. § 548(a)(1) and § 548(a)(2) reads as follows:

"The trustee may avoid any transfer of any interest of the debtor in property, or any obligation incurred by the debtor, that was made or incurred on or within one year before the date of the filing of the petition, if the debtor—

(1) made such transfer or incurred such obligation with actual intent to hinder, delay or defraud any entity to which the debtor was or became, on or after the date that such transfer occurred or such obligation was incurred, indebted; . . .

(2)(a) received less than a reasonably equivalent value in exchange for such transfer or obligation; and

(B)(i) was insolvent on the date that such transfer was made or such obligation was incurred, or became insolvent as a result of such transfer or obligation;

(ii) was engaged in business, or was about to engage in business or a transaction, for which any property remaining with the debtor was an unreasonably small capital; or

(iii) intended to incur or believed that the debtor would incur, debts that would be beyond the debtor's ability to pay as such debts matured."

diately prior to the sale of stock are relevant to and provide an interesting background to the events that transpired in the subsequent and closing months of April through July 1980. In December 1979, Metro executed a promissory note payable to CCI in the principal amount of $296,000.00, based on a purported indebtedness which extended back over a three-year period.[3] See Pl. Ex. # 5. Despite the existence of a scheduled liability to its parent, CCI, this liability was never in fact noted in the "pro forma" balance sheet for the period ending December 31, 1979. See Pl. Ex. # 2. In addition, the promissory note itself was assigned to Hugh Robinson as a part of the stock sale transfer in March of 1980. See Pl. Ex. # 6. DeFranco's testimony clearly established that although he could give no specific reason for the transfer of the promissory note to Hugh Robinson, it was intended as a cancellation of the indebtedness to CCI.[4] See Tr. at 24–25. In addition, the balance ꞏsheet and attached income statement reflect a year-end loss on December 31, 1979, of $32,280.00 for the debtor, Metro Paper. See Pl. Ex. 2; Tr. at 18–19.

Upon Hugh Robinson's acquisition of Metro's business in April 1980, the same documentary evidence reflects a consistent and substantial series of cash transfers to the parent corporation, CCI, which the Court concludes were made without any consideration. The background and setting for these transfers is, to some extent, highlighted by a letter to Hugh Robinson on May 16, 1980, in which DeFranco states:

"The payment for the stock of Metro Paper is not coming in an expeditious

manner. Six weeks have passed since we consummated the sale. Per our discussion last week, you still have not made any attempt to contact any companies about factoring to finance the purchase. Though I can sympathize with your problems of getting married in the next few weeks, get on the stick." (Pl. Ex. # 3).

Three days later DeFranco, based on a prior "discussion," states:

"Pursuant to our discussion the other day, we will start to take back those inventory packaging items that you do not wish to sell as partial payment on monies due. Our lawyer advises us, that you should bill us at cost plus 10% and we will issue you a check in payment of your invoice. Simultaneously, you will give us a check back as payment on your account." (Pl. Ex. # 4).

The books and records examined by Mr. Wicks, an accountant retained by the trustee in bankruptcy to examine the specific transfers, reflect aggregate transfers of $304,120.86 from April 1, 1980 through July 31, 1980. These transfers were characterized in the disbursements journal as either "loan payable" exchange or "purchases." With the exception of $10,036.24 for purported purchases, the bulk of the check transfers to CCI were for a "loan payable." In fact, in the month of July alone (which was the month preceding the filing of the involuntary petition for bankruptcy), $172,988.20 was transferred to CCI for a purported loan payable." (See Exhibit 15 attached as Appendix A). The net amount actually transferred, allowing for "possible duplicates," was the sum of $278,785.95.[5]

---

3. Metro Paper, the debtor herein, was first incorporated in the District of Columbia in 1976 according to Richard DeFranco, as a result of CCI's acquisition of the assets of Jacobs Paper Company in 1974. See Tr. at 13–14.

4. In fact, the documentary evidence adduced by the trustee clearly reflects that substantial loan repayments were made to CCI, the parent corporation, even prior to April 1, 1980. Ledger entries (Pl. Ex. # 12) for example, in February 1980 reflect that a number of entries were made as early as February 1980 for loan payables. However, one entry reflects $15,800 for "purchases," but the summary in fact shows

"loan payable CCI—$35,800." Notations in the same ledger show that the note was released on March 21, 1980.

5. The testimony of Mr. Wicks reflects, in apparent accord with the understanding expressed in the letter of May 19, 1980 (Pl. Ex. # 4), that of the cash flow transactions between these corporate entities (namely, checks written by CCI to Metro and subsequent checks given back to CCI by Metro), during the timeframe from April through July, 1980, there were deposits to exactly match the sum of $221,635.20. The accountant's review of these records was limited to an analysis of the check

These transfers occurred as late as July 31, 1980, and on August 15, 1980, the involuntary petition in bankruptcy was filed. The business, however, had effectively ceased to operate in early August of 1980, and the physical assets of the corporation were, at this point in time, of only minimal value.[6]

There is absolutely nothing in the books and records of the debtor to justify these transfers as payments for a "loan payable."[7] The only loan due to CCI was "cancelled" in March 1980, and during the April through July timeframe, the only loan outstanding was the personal liability of Hugh Robinson flowing from the sale and purchase of Metro's stock. *See* Pl. Ex. # 7. Furthermore, based on the evidence of record, it appears that the debtor herein might have been insolvent in the Bankruptcy Code sense[8] in December 1979, based on the pro forma balance sheet of December 31, 1979. *See* Pl. Ex. # 2. However, it is clear from the evidence, that the transfers from April through July of 1980 resulted in the insolvency of the debtor.

## CONCLUSIONS OF LAW

*I. 11 U.S.C. § 548(a)(1): Actual Intent to Hinder, Delay or Defraud Creditors.*

Based on the evidence of record adduced by the trustee in bankruptcy, it is not disputed that the subject transfers took place "within one year before the date of the filing of the petition," and, accordingly, the sole issue for resolution is whether "the debtor made such transfer . . . with actual intent to hinder, delay or defraud" creditors.

In determining the actual intent, the Court must look to the particular circumstances of the case for, as appropriately stated in Collier on Bankruptcy:

> "Even under Section 548(a)(1) the finding of the requisite intent may predicate upon the concurrence of facts which, while not direct evidence of actual intent, lead to the irresistible conclusion that the transferor's conduct was motivated by such intent."

4 Collier on Bankruptcy § 548.02[5] at 548–33 (15 ed. 1981). Moreover, because actual, and not implied, fraud is alleged, the burden of proof must be by clear and convincing evidence.

▮ After consideration of all the documentary evidence adduced, and after assessing the credibility of the witnesses, the Court concludes that there is clear and convincing evidence of a planned series of maneuvers to strip the debtor Metro of its assets by a so-called series of "loan payable" transfers and repayments for so-called "purchases" between the two corporations. In this regard, the Court concludes that the sale of Metro stock to Robinson in April 1980 was a sham transaction itself

stubs, account disbursements journal, and corresponding bank statements of Security National Bank, but this Court concluded after a review of such evidence, taken in its totality, and when considered in the light of Mr. DeFranco's testimony, and with particular reference to both Exhibits 3 and 4, that the payments were in fact made to CCI.

6. The filed accounting of the trustee in bankruptcy of which the Court takes judicial notice, reflects that a total of only $10,000.00 was realized from a public auction of the equipment and inventory of Metro Paper. Based on the filed schedules (*see* Schedule A–3, unsecured claims without priority), there was in excess of approximately $670,000.00 worth of indebtedness incurred during the period April through August 1980.

7. The Court also notes that with reference to the accounting ordered by this Court on September 26, 1980, in Adversary Proceeding 80–0061, the accounting (which is marked as Pl. Ex. # 1) indicates that CCI had made purchases from Metro during this period of time in the amount of $189,000.00 and in turn had sold merchandise to Metro during the same period of time in the amount of approximately $63,-000.00. Even if the Court were to accept the records of CCI, the parent corporation, there is a net flow of funds from Metro to CCI of $126,000.00.

8. Insolvency is defined in § 101(26) of the Bankruptcy Code as:

> (A) with reference to an entity other than a partnership, financial condition such that the sum of such entity's debts is greater than all of such entity's property, at a fair valuation exclusive of—(i) property transferred, concealed, or removed with intent to hinder, delay, or defraud such entity's creditors;"

which later resulted in CCI being in a position to receive cash transfers in satisfaction of the personal liability of Hugh Robinson to CCI for the purchase of Metro stock. In fact, the movement of monies occurred even prior to the sale of Metro stock in April 1980, as evidenced by the cash disbursements journal of Metro Paper.[9] *See* Pl. Ex. # 12. Such transfers were obviously made without regard to the needs of creditors as evidenced by Metro's cessation of business in August 1980, with only nominal assets on hand. This Court is satisfied, based on the trustee's evidence, that such transfers were made with the "actual intent to hinder, delay, or defraud creditors and thus satisfy the proscriptions of 11 U.S.C. § 548(a)(1)."[10] The following facts are relied upon in determining actual intent within the parameters of the pending proceeding.

First, CCI, as the parent of Metro, and acting through its principal officer and stockholder, Richard DeFranco, was in a position to control the disposition of Metro's assets. Robinson, a former salesman of CCI, was the sole stockholder of Metro after April 1, 1980, and the documentary evidence clearly establishes that the "purchase" of Metro merchandise by CCI was orchestrated with the controlling officer of Metro. *See* Pl. Exs. 3 and 4. Although so-called purchases were made each month by CCI, for which checks in turn were given to Metro and then to the extent of approximately $221,635.20 transferred back to CCI, the ledger transaction of Metro reflects for the most part that the transfers were for a "loan payable." Although, the evidence reflects a clear series of transfers from the once wholly-owned subsidiary to its former parent CCI, the characterization of what these transfers were for is hardly credible proof of actual consideration flowing between the parties.

Second, at the time of the sale of stock (*see* Pl. Ex. # 7), in April 1980, a promissory note executed on December 31, 1979 and made payable to CCI for purported transfers of merchandise from CCI to Metro over a period of three years from Metro's existence in 1976, was in turn assigned to Hugh E. Robinson, and intended as a cancellation of indebtedness. No credible explanation could be offered by DeFranco as to this transaction, and the Court concludes, based on the review of evidence in its totality, that it was in fact a sham and a device for the series of cash transfers which later occurred during the April through July timeframe.

Third, despite a sale of an allegedly-healthy business in April 1980, the principal officer of CCI could not, under questioning by his own counsel, establish whether the shares of stock were ever placed in escrow,

---

9. The Court places little credibility on the testimony of the president of CCI, Richard DeFranco, with respect to the explanation concerning the financial condition of Metro in December 1979, as well as the subsequent events culminating in the sale of Metro stock to Hugh E. Robinson, who in March 1980, was a salesman of CCI. DeFranco's testimony was equivocal and vague as to the underlying reasons surrounding the sale of stock in April 1980, as evidenced by such testimony as: Question (propounded by defendant's attorney): ". . . To your knowledge, were shares of stock for Metro ever assigned to an escrow account, [by] either myself or anyone else?" "Answer: They were supposed—they were supposed to have been. Question: Do you know whether they were? Answer: I believe that they—I don't know whether they were or not. The mechanics I turned over to the accounting people at that time and told them to handle it." Tr. at 42–43.

10. The defendant, in not adducing any evidence to rebut the trustee's case in chief, chose instead to rely upon the fact that the trustee did not produce (and the accountant in turn did not rely upon) the cancelled checks payable to CCI with respect to the asserted transfers at issue. However, the evidence adduced, and relied upon in turn by the accountant in connection with his review of the books and records, was sufficient to establish such transfers in the opinion of the Court. The accountant, in reviewing the books and records of the debtor corporation which were kept in the regular course of business and as noted in the pretrial statement admitted without objection, relied upon the usual and customary indices of payment; namely, check stubs, disbursement journal entries, and corresponding bank statements. Such documentation is clearly admissible evidence to establish the facts at issue. *See* 2 Jones on Evidence, § 12:6 at 342–43 (1972); 68 A.L.R. 692–695.

or whether a separate security agreement and financing statement were ever drafted to secure CCI's interest as a result of the sale transaction.

Fourth, the only loan outstanding to CCI after April 1, 1980, was the loan payable from Hugh E. Robinson. Yet the only payments due under the stock sale agreement would be interest payments each month which would not exceed $2,000.00 per month at the maximum (namely, 12% stated rate of interest per annum on a principal balance due and owing of approximately $247,000.00).

The Court concludes with reference to the testimony of DeFranco and the documentary evidence adduced by the trustee that there is clear and convincing evidence of an actual intent to hinder, delay, and defraud creditors by reference to the above facts of record. The manifestation of actual fraud, as required by the express language of 11 U.S.C. § 548(a)(1), takes many forms depending on the business transactions entered into. *See Lytle v. Andrews*, 34 F.2d 252 (8th Cir. 1929); *M.V. Moore & Company v. Gilmore*, 216 F. 99 (4th Cir. 1914); *Chorost v. Grand Rapids Factory Show Rooms, Inc.*, 172 F.2d 327 (3rd Cir. 1949). Certainly, the facts in this proceeding clearly establish the required elements of actual fraud.

### II. *Fraudulent Transfer §* *548(a)(2)—Implied Fraud*

In establishing fraud pursuant to § 548(a)(2), the trustee in bankruptcy must prove three distinct elements; namely, that the transfer was made "within one year before the date of the filing," that the debtor "received less than a reasonably equivalent value in·exchange," [11] and that the debtor was insolvent on the date that such "transfer was made . . . or became insolvent as a result of such transfer or obligation." It is clear that if the trustee is ·

successful in establishing these elements of implied fraud, there is no need to establish actual intent as required by the preceding subsection 548(a)(1). As stated in 4 Collier on Bankruptcy § 548.03 at 548–43 (15 ed. 1981):

> "If the two conditions are present, *viz.*, 'less than reasonably equivalent value' and insolvency or resulting insolvency, there is a conclusive presumption of fraud, any intent to the contrary withstanding." [Footnote omitted]

As noted in the Findings of Fact, the transfers in question, which took place within four months of the filing of the petition of bankruptcy, clearly occurred at a time when the debtor was insolvent. In fact, if one accepts the promissory note executed and made payable to CCI in December 1979 as valid, the insolvency of Metro in the bankruptcy code sense potentially could have been established as early as December 1979, if not at an earlier date. Without reference to the promissory note, it is clear from the documentary evidence of record, that the transfers that occurred between April and July of 1980 clearly resulted in the debtor becoming insolvent.

The remaining issue as to "less than reasonably equivalent value" hinges upon the validity of the actual check transfers that were conducted between CCI and Metro and as explained by the trustee's expert witness, Mr. Michael Wicks. In determining the bona fides of these transfers, and with specific reference to the issue of consideration for the actual check transfers, the Court has weighed and considered not only the testimony of Mr. Wicks, but also the testimony of Mr. DeFranco. The only logical conclusion that the Court can draw from these transfers is that there was in fact no meaningful business purpose intended, and certainly no benefit flowing to the debtor.[12] Moreover, there is no evidence to

---

11. The Bankruptcy Code, 11 U.S.C. § 548(d)(2)(A) further defines value as:

> (A) "value" means property, or satisfaction or securing of a present or antecedent debt of the debtor, but does not include an unper-

formed promise to furnish support to the debtor or to a relative of the debtor;"

12. The documentary evidence, as previously set forth in the Findings of Fact, clearly reflects that the transfers were consistently and regularly made to CCI under the guise of "loan

establish that the check transfers were in consideration for purchases made from CCI. To the contrary, the accounting records of CCI, as limited as they are in response to this Court's Order of September 26, 1980, reflects gross purchases from Metro in excess of $189,000.00 and no repayment for same. In fact, the evidence reflects that by writing checks to Metro for the transfer of merchandise and then receiving back a check for the same amount, a fiction was created which enabled CCI to be supplied with Metro's assets at no cost to CCI.[13]

For the reasons set forth above in this Memorandum Opinion, the Court concludes that under either section of the Bankruptcy Code, 11 U.S.C. § 548(a)(1) or (a)(2), the transfers were fraudulent and accordingly, judgment will be entered for the trustee against the defendant in the full sum of $278,785.95, with interest from the date of judgment at the statutory rate, together with all costs of this proceeding.[14]

In accordance with requirements of Bankruptcy Rule 921, a separate order and judgment will be entered forthwith.

payables." Yet, the only purported loan outstanding to CCI from Metro was admittedly cancelled in March of 1980. In fact, Richard DeFranco specifically testified that:

"Answer: It was a cancellation of a debt; that was the intent." (Tr. at 42).

The only remaining loan obligation (after a review of all the evidence of record) was the obligation of Hugh Robinson to repay CCI for the former's purchase of Metro's stock in April of 1980, which obligation was the personal obligation of Hugh Robinson and not of the corporate entity, the debtor herein, Metro Paper. Moreover, the obligation of Hugh Robinson, with the exception of interest payments, to repay the $247,000.00 was not due until "six (6) months from the date of the execution of this Agreement..." (Pl. Ex. 7, § 3).

13. As already noted in this Opinion, the defense of CCI seems to be based upon the fact that there were no actual checks introduced into evidence by the trustee to show actual payment to CCI for all of the transfers in question. However, there is, to the Court's satisfaction, after a review of all the documentary evidence, clear and convincing evidence of an intent on the part of CCI, the parent company, to milk Metro of its assets. The Trustee's Ex-

hibits 3 and 4, set forth the mechanics for such transfers and are in fact buttressed by the documentary evidence which was in fact reviewed and relied upon by the accountant. The mere fact that the accountant did not do an in-depth audit, according to regularly-accepted accounting practices, does not derogate from the fact that the available evidence is admissible, and in the Court's opinion, sufficient to establish the transactions at issue.

14. Although the accounting figures supplied to this Court in response to its Order of September 26, 1980 in Adversary Proceeding # 80–0061, reflect that there was merchandise supplied to Metro from CCI in the amount of $63,000.00, the Court, for reasons already stated in this Opinion, does not accept the accounting as either credible or in any way substantiated in view of the already demonstrated transfers of cash between Metro and its parent CCI. The Court, obviously, accepts the testimony of the expert witness Mr. Michael Wicks, and finds that there is sufficient evidence to support actual cash transfers in the full net sum of $278,785.95.

## APPENDIX A

Prep by [illegible] 12/3/3[?]
√ by

Metro Paper Company Inc
Payments From Metro Paper
to Capital Chemical

| All items traced to check stubs and cash disbursement journals | Check number | Date of check | Amount | |
|---|---|---|---|---|
| Loan payable | 080 | 3/13/80 | 5000 00 | |
| Payroll expense | 081 | 3/13/80 | 5000 00 | |
| Loan payable | 114 | 3/19/80 | 5000 00 | |
| ✓ | 123 | 3/24/80 | 5000 00 | |
| ✓ ✓ | 144 | 3/28/80 | 5000 00 | |
| ✓ ✓ | 166 | 3/31/80 | 5000 00 | |
| Amount transferred prior to 4/1/80 | | | 30000 00 | |
| Loan payable | 173 | 4/1/80 | 5000 00 | |
| ✓ ✓ | 222 | 4/1/80 | 4000 00 | |
| ✓ ✓ | 230 | 4/15/80 | 10000 00 | |
| ✓ ✓ | 237 | 4/16/80 | 1124 85 | |
| ✓ ✓ | 256 | 4/18/80 | 1000 00 | |
| ✓ ✓ | 281 | 4/24/80 | 3000 00 | |
| Exchange | 294 | 4/28/80 | 15298 67 Δ | |
| ✓ ✓ | 325 | 5/8/80 | 15298 67 (A) | |
| ✓ ✓ | 326 | 5/8/80 | 731 75 Δ | |
| Purchases | 341 | 5/12/80 | 10036 24 (A) | |
| Loan payable | 368 | 5/15/80 | 5000 00 | |
| Loan payable - Acct in full | 377 | 5/16/80 | 5000 00 | |
| Exchange | 385 | 5/21/80 | 10036 24 Ø | |
| Loan payable | 396 | 5/23/80 | 9863 94 Δ | |
| ✓ ✓ | 398 | 5/27/80 | 12027 18 | |
| ✓ ✓ | 547 | 7/8/80 | 10999 74 Δ | |
| ✓ ✓ | 555 | 7/9/80 | 9628 83 Δ | |
| ✓ ✓ | 556 | 7/1/80 | 8551 75 Δ | |
| ✓ ✓ | 560 | 7/11/80 | 12762 42 Δ | |
| ✓ ✓ | 561 | 7/1/80 | 18078 35 Δ | |
| ✓ ✓ | 562 | 7/14/80 | 31260 68 Δ | |
| ✓ ✓ | 570 | 7/17/80 | 10886 72 Δ | |
| ✓ ✓ | 571 | 7/18/80 | 3500 00 | |
| ✓ ✓ | 587 | 7/18/80 | 9514 74 Δ | |
| ✓ ✓ | 588 | 7/13/80 | 9800 00 Δ | |
| ✓ ✓ | 589 | 7/13/80 | 11200 00 Δ | |
| ✓ ✓ | 590 | 7/15/80 | 10700 00 Δ | |
| ✓ ✓ | 591 | 7/15/80 | 11000 00 Δ | |
| ✓ ✓ | 592 | 7/17/80 | 11600 00 Δ | |
| Δ agrees with exact deposit 221635.20 | 593 | 7/18/80 | 10400 00 ΔΔ | |
| Ø deposit same day but only 10036.24 for ⁸9513.76 ✓ 23167.44 | 594 | 7/21/80 | 7601 71 Δ | |
| | 595 | 7/31/80 | 1255 38 | |
| | | | 301120 86 | |
| Less possible duplicates | | | (23334 91) (A) | |
| Amount transferred 4/1/80 - 7/31/80 | | | 278785 95 | |