In the Matter of NATIONAL SAFE NORTHEAST, INC., Debtor.

Neal OSSEN, Trustee, Plaintiff,

v.

Anthony BERNATOVICH, Lynn Bernatovich, Defendants.

Bankruptcy No. 2–86–00110.
Adv. No. 2–86–0078.

United States Bankruptcy Court, D. Connecticut.

July 29, 1987.

Howard L. Siegel, and Scott D. Rosen, Hoberman & Pollack, P.C., Hartford, Conn., for plaintiff-trustee.

Samuel B. Feldman, Alan B. Silver, and Mark R. Cramer, Lublin, Wolfe, Kantor & Silver, East Hartford, Conn., for defendants.

## MEMORANDUM OF DECISION

ROBERT L. KRECHEVSKY, Chief Judge.

### I.

In this adversary proceeding, Neal Ossen, the trustee in the above chapter 7 case, seeks to recover money damages from the debtor's two corporate officers and directors. The amended complaint, containing seventeen counts, asserts causes of action based upon theories of fraudulent transfer, preference, unauthorized postpetition transfers, unauthorized use of cash collateral, and violation of the corporate opportunity doctrine.[1] Evidentiary hearings held between August 21, 1986 and November 25, 1986 established the following general background. The findings and conclusions as to specific allegations of the complaint will thereafter be separately considered.

### II.

### GENERAL BACKGROUND

National Safe Northeast, Inc., the debtor, filed a chapter 11 petition on January 31, 1986. At that time, and for the prior ten years, the debtor was in the business of

---

1. The parties have stipulated that the court shall enter a final judgment on all matters, subject to review under 28 U.S.C. § 158.

selling, installing, and maintaining security equipment, such as closed-circuit television, vault doors, teller windows, and alarm systems, to banks located primarily in New England. The defendant, Anthony Bernatovich (Bernatovich), is the debtor's sole stockholder, its president, and a director. The defendant, Lynn Bernatovich, Anthony's wife, is the debtor's vice-president, secretary, and a director. The debtor did not fabricate equipment but acted as a distributor for various manufacturers. The debtor maintained a sales force, a service and maintenance department, and an office located at 21–C Culbro Drive, West Hartford, Connecticut.

During 1984, the debtor's business began to suffer because of a decline in the opening of bank branches with the increased installation of isolated automatic teller machines. Bernatovich formed a new corporation, ATM Concepts, Inc. (ATM), in September, 1984 to enter the market of designing and installing the "environments" for these machines. The environments are the uniquely designed settings in which automatic teller machines are located. ATM subcontracted out the construction of the environments. Bernatovich was the sole stockholder of ATM, and he and his wife were ATM's officers and directors. ATM hired a graphic designer, a salesman, and an administrative assistant, and used the debtor's office and phone number, although ATM paid no rent or other expenses. The debtor's sales staff included ATM products in their line. ATM went out of business in December, 1985, a month before the debtor filed its bankruptcy petition.

Upon the motions of various creditors, the bankruptcy court, on March 21, 1986, appointed Neal Ossen as trustee in the chapter 11 case, and on April 3, 1986, converted the case to one under chapter 7. Ossen then became the chapter 7 trustee and filed his complaint on May 14, 1986. One finding central to many of the trustee's allegations is at what time the debtor was rendered insolvent. The court will first determine that issue.

## III.

### DATE OF INSOLVENCY

In fraudulent transfer and preference actions under the Bankruptcy Code (Code), insolvency is determined according to the "balance sheet" test. 11 U.S.C. § 101(31) states that " 'insolvent' means—(A) ... financial condition such that the sum of such entity's debts is greater than all of such entity's property, at a fair valuation, exclusive of—(i) property [fraudulently] transferred ...." The same test applies under Connecticut's fraudulent conveyance statute, Conn.Gen.Stat. § 52–552. *United States v. Edwards*, 572 F.Supp. 1527, 1535 (D.Conn.1983) ("The proper procedure for determining solvency [under § 52–552] is to balance assets against liabilities.").

Notwithstanding the fact that five months prior a financial statement of the debtor indicated its net worth at negative $89,269.00, the debtor's bankruptcy schedules, based on information supplied by Bernatovich, portrayed its assets as exceeding liabilities on the date of its petition. The schedules valued the debtor's property at $405,696.81 and listed debts totaling $404,768.71. Based primarily on the debtor's own records and the trustee's use of retrojection, *see* note 4 *infra*, I find that the debtor, on a balance sheet test, was continuously insolvent after November 30, 1984.

The debtor customarily issued an annual financial statement, prepared by outside certified public accountants, for each fiscal year ending August 31. The statement for the year ending August 31, 1984 showed that the debtor had sustained a net loss of $5,494.00, compared to a net profit of $57,320.00 for the prior year. Its net worth as of August 31, 1984, was stated to be $126,451.00. The August 31, 1985 draft annual statement prepared by Roger D. Carney, the debtor's outside certified public accountant since 1978, disclosed a net loss of $215,720.00 for the year, and placed the debtor's net worth at negative $89,269.00.

Through Myron Orloski, an officer of the debtor and its general manager from October, 1984 to October, 1985, the trustee introduced into evidence monthly state-

ments, produced by the debtor's computer, that reflected the profit or loss for each month of the debtor's operation. The trustee sought to establish the month of the debtor's initial insolvency by adding subsequent profits and subtracting subsequent losses from the adjusted net worth of the debtor as of August 31, 1984. Because Carney testified that the debtor chose not to include a reserve for bad debts in its financial statements, the trustee applied a bad debt deduction of 2.6% to $804,868.00 of receivables ($21,072.00) to establish a starting adjusted net worth for the debtor on August 31, 1984 of $105,379.00.[2] For the months of September, October, and November, 1984 the debtor sustained a net operating loss of $123,389.00, resulting in a net worth of negative $18,010.00 on November 30, 1984.[3] Based upon the monthly statements for all of the months remaining through December, 1985, at no subsequent time did the debtor ever regain solvency.[4]

The defendants' attempts to offset this method of establishing insolvency are not persuasive. They do not attack the legitimacy of the trustee's use of the debtor's monthly statements. The defendants first argue that the value for the fixed assets shown on the 1985 financial statement ($66,909.00) was based upon book value (cost minus depreciation) and not market value. *See* 11 U.S.C. § 101(31) (insolvency based on "fair valuation" of debtor's as-

sets). However, when, five months later, the debtor filed its bankruptcy petition, Bernatovich placed a fair market value on its fixed assets of $57,075.00.[5] These assets, sold on May 9, 1986 by the trustee at auction, realized $40,124.50.[6] There was no evidence of any substantial change in fixed assets prior to the filing. Bernatovich's own assessment of the fair market value of the debtor's fixed assets indicates that the book value of these assets did not differ significantly from the fair market value.

The defendants next seek to rely on the debtor's bankruptcy schedules, which, as noted, reflected a marginal solvency. The schedules, compared to the debtor's other records, are not reliable. The debtor, for example, failed to list as a liability uncompleted contract claims, i.e., where customers had made deposits and progress payments for work not yet done. These claims were set at $742,000.00 and $636,000.00 by Carney in the respective annual statements he prepared for the years ending August 31, 1985 and 1984. Claims based on such liabilities, totaling $137,000.00, have in fact been filed in this estate. Furthermore, the debtor listed some $28,000.00 of inventory owned by a third party and uncollectible accounts receivable as assets. The court concludes that the trustee has clearly and convincingly established the debtor's insolvency on and after November 30, 1984.

2. Carney testified that the $804,868.00 of receivables included two overdue debts which had been placed in the hands of a collection attorney. These two debts, Maine Savings Bank ($12,990.72) and Suncook Bank ($8,089.90), remained uncollected as of the filing, and the trustee testified they were uncollectible and that, in fact, the debtor had previously released the Maine Savings Bank debt.

3. The debtor sustained a further loss of $80,074.64 in December, 1984.

4. "A bankrupt's insolvency on a transfer date may be shown by using company books and other financial records, and by working backwards after the critical date, thereby proving '... other factors from which the ultimate fact of insolvency on transfer dates may be inferred or presumed'. This method (retroject) of determining insolvency is not novel and it has often been utilized in bankruptcy proceedings."

*Inland Security Company, Inc. v. Estate of Kirshner*, 382 F.Supp. 338, 345 (W.D.Mo.1974) (citations omitted).

The trustee used August 31, 1984 as a starting point and adjusted forward for the debtor's monthly changes. If, however, the trustee had used August 31, 1985 and adjusted the monthly changes backward, the initial date of insolvency would remain at November 30, 1984.

5. The debtor's schedules listed certain fixed assets and inventory together under the heading of "Inventory". At trial, Bernatovich separated this list into inventory and fixed assets. The value placed by Bernatovich on the fixed assets listed in those schedules was $13,350.00. Motor vehicles were separately valued at $43,725.00, for a total value of $57,075.00 for fixed assets.

6. Inventory was sold at the same auction for an additional $18,298.00.

## IV.

### TRUSTEE'S FRAUD CLAIMS RELATED TO PREPETITION SALARIES AND EXPENSE REIMBURSEMENT

The trustee contends that Bernatovich is liable under the Code fraudulent conveyance provision for a portion of the salaries he drew and the expenses reimbursed him for the period from February 1, 1985, to January 31, 1986. He makes the same claim for the period prior to February 1, 1985, based upon Conn.Gen.Stat. § 52–552, which does not contain the one-year limitation in the comparable Code provision.

### A.

Bernatovich increased his annual salary, starting September 1, 1984, to $110,400.00, despite the debtor having sustained a loss during the prior year. As previously noted, Bernatovich incorporated ATM, his other wholly-owned company, in September, 1984, and ATM's employees thereafter operated out of the debtor's office. Bernatovich drew no salary or expense reimbursement from ATM.

The trustee presented credible testimony from former employees of the debtor concerning the small amount of time Bernatovich spent working for the debtor after September, 1984, compared to the time he spent on ATM purposes. Three employees variously estimated that Bernatovich spent from fifty to ninety percent of his time on ATM matters. Independent corroboration of this testimony exists in the form of a document that Bernatovich and Orloski jointly prepared, entitled "ATM Concepts, Inc. Costs Incurred by National Safe Northeast, Inc. 10/84—9/85." The document was made at Carney's suggestion to provide figures for outside investors or for a possible public offering of ATM stock. In this document, Bernatovich and Orloski applied fifty percent of Bernatovich's annual salary for the period ($50,600.00) as time devoted to ATM.[7] Carney testified that the document was intended as an estimate of the actual amount of time and money in-

vested in ATM from October, 1984 to September, 1985. Bernatovich contends that the testimony from the employees and the figures on the document are nothing more than pure speculation.

I conclude that fifty percent of Bernatovich's salary from December 1, 1984, through January 31, 1986, represents payments by the debtor to Bernatovich for which the debtor received no consideration. In so doing, I reject Bernatovich's further assertion that even if he spent "only 10 to 20 percent" of his time on the debtor's duties, the trustee has not proved that this time was not worth the money Bernatovich received. In light of this holding, the court need not consider the trustee's alternate contention that, based upon the debtor's net loss incurred in 1984, the significant loss incurred in 1985, the comparable size of salaries of other employees of the debtor, and the nature of Bernatovich's duties, Bernatovich's salary was excessive.

### B.

In the year preceding the bankruptcy petition, the debtor paid Bernatovich $23,-392.01 as reimbursement to him for expenses. During the same period, the debtor made direct payments to credit card companies for expenses incurred by Bernatovich totaling $23,488.04. For the prior fiscal year ending August 31, 1984, Bernatovich's total expenses paid by the debtor amounted to less than $15,000.00. Carney testified that he had expressed his concern to Bernatovich over the size of the 1984 expenses in light of the debtor's financial condition.

Darlene Mercure, an employee of the debtor from 1981 through December, 1985, testified that Bernatovich "double-billed" the debtor. She stated that she was responsible for making out expense reimbursement checks until October 1985, and that the monies the debtor paid Bernatovich on two occasions for his expenses du-

7. The document further attributed 30% of Orloski's salary, 30% of utilities, office rent and supplies, 30% of salesmen's salaries and ex-

pense, 90% of long-distance phone calls, and 50% of car rentals, *inter alia*, to ATM.

plicated the bills paid on credit cards.[8]  The defendants denied there was any such practice, and two former employees stated they were unaware of any such practice.  Mercure's testimony, which I credit, is supported by the extraordinary jump in expenses from $15,000.00 for the year ending August 31, 1984, to $47,000.00 for the calendar year 1985.  I conclude that the $23,-392.01 paid by the debtor to Bernatovich duplicated expenses already paid by the debtor.

### C.

The statutory bases asserted by the trustee for recovery from Bernatovich on the facts found in sections A. and B., *supra*, are Code § 548(a) and Conn.Gen.Stat. § 52–552.  Section 548(a) states in part:

> The trustee may avoid any transfer of an interest of the debtor in property, or any obligation incurred by the debtor, that was made or incurred on or within one year before the date of the filing of the petition, if the debtor voluntarily or involuntarily—
>
> (1) made such transfer or incurred such obligation with actual intent to hinder, delay, or defraud any entity to which the debtor was or became, on or after the date that such transfer was made or such obligation was incurred, indebted;  or
>
> (2)(A) received less than a reasonably equivalent value in exchange for such transfer or obligation;  and
>
> (B)(i) was insolvent on the date that such transfer was made or such obligation was incurred, or became insolvent as a result of such transfer or obligation ....

Code § 544(a) (the "strong-arm" clause) gives the trustee standing to contest transfers under state law.  Conn.Gen.Stat. § 52–552 provides:

> All fraudulent conveyances ..., made or contrived with intent to avoid any debt or duty belonging to others, shall, notwith-

standing any pretended consideration therefor, be void as against those persons only, their heirs, executors, administrators or assigns, to whom such debt or duty belongs.

While § 548(a)(1) and (2) cover only transactions made within one year of bankruptcy, § 52–552 has no such limitation. The Connecticut Supreme Court has held that a creditor has under § 52–552 the option of proving "either (1) that the conveyance was made without substantial consideration and rendered the transferor unable to meet his obligation or (2) that the conveyance was made with a fraudulent intent in which the grantee participated." *Bizzoco v. Chinitz*, 193 Conn. 304, 312, 476 A.2d 572 (1984).  Accordingly, in addition to a showing of actual fraud, a transfer may be avoided under either § 52–552 or § 548(a)(2) upon a showing of insolvency and that the transfer was made "without substantial consideration" or for "less than a reasonably equivalent value."

■ Ordinarily, the burden of proving all elements of a fraudulent transfer is on the plaintiff.  *Rubin v. Manufacturers Hanover Trust Co.*, 661 F.2d 979, 993 (2d Cir. 1981).  Where the fraud alleged is constructive, such as failure of consideration as in part IV. A., *supra*, the standard is preponderance of the evidence.  *Talbot v. Warner (In re Warner)*, 65 B.R. 512, 518–19 (Bankr.S.D.Ohio 1986);  *cf. Tyler v. Capitol Chemical Industries (In re Metro Paper, Inc.)*, 18 B.R. 56, 59 (Bankr.D.D.C. 1982) ("because *actual*, and not *implied*, fraud is alleged, the burden of proof must be by clear and convincing evidence.") (emphasis added).  Where the allegation may be considered one of actual fraud, as in part IV. B., *supra*, the standard is clear and convincing evidence.  *Central Trust Co. v. Burchett (In re Willson Dairy Co.)*, 30 B.R. 67, 70 (Bankr.S.D.Ohio 1983) (federal law);  *J. Frederick Scholes Agency v. Mitchell*, 191 Conn. 353, 358, 464 A.2d 795

---

**8.**  The trustee found no employee expense reimbursement reports among the debtor's records.

Bernatovich stated that many records may have

(1983) (Connecticut law).[9] Where the alleged fraudulent grantee is a fiduciary, such as an officer or director of a corporation, such grantee bears the burden of proving good faith and fair dealing on his part. *See Inland Security Co. v. Estate of Kirshner*, 382 F.Supp. 338, 349 (W.D.Mo. 1974); *Duberstein v. Werner*, 256 F.Supp. 515, 521 (E.D.N.Y.1966); *O'Connell v. Hoban (In re Famous State Fair Meat Products, Inc.)*, 19 B.R. 48, 51 (Bankr.E.D.Pa. 1982) (federal law); *Dunham v. Dunham*, 204 Conn. 303, 322–23, 528 A.2d 1123 (1987) (Connecticut law).[10] In sections A. and B., *supra*, I conclude that the trustee prevails no matter what standard is applicable. I find under § 548(a)(2) that the debtor, while insolvent, paid Bernatovich $50,-600.00, representing one-half of the salary for the period February 1, 1985 to January 31, 1986, for which the debtor received no consideration. For the months of December, 1984 through January 31, 1985, I make the same findings under § 52–552 for the sum of $9,700.00 paid by the debtor to Bernatovich. Finally, I conclude that the sum of $23,392.01 paid by the debtor to Bernatovich ostensibly for expense reimbursement was obtained either for no consideration or by actual fraud, and that Bernatovich is liable for that amount to the trustee.

## V.

### TRUSTEE'S FRAUD CLAIMS RELATING TO AUTOMOBILES AND FURNITURE

#### A.

For several years prior to January, 1986 Bernatovich leased his Mercedes-Benz automobile to the debtor at a monthly rental of $1,900.00.[11] From December 1, 1984 to December 31, 1985, the debtor made car lease payments to Bernatovich totaling $24,-700.00. Bernatovich sold the car in January, 1986. For reasons discussed in part IV at note 7, *supra*, fifty percent of the use of the Mercedes-Benz was for the benefit of ATM. To that extent, therefore, the trustee has shown that the debtor received less than reasonably equivalent value in exchange for the lease payments at a time when the debtor was insolvent. The trustee may recover the sum of $12,350.00 from Bernatovich pursuant to § 548(a)(2) and § 52–552.

#### B.

On August 22, 1985, Bernatovich caused two automobiles owned by the debtor to be traded in for a Chevrolet Monte Carlo automobile. Bernatovich took title to the Monte Carlo in his name. The two automobiles had a trade-in value of $7,179.00, and Bernatovich has admitted that "[t]he debtor received no consideration for the trade of the ... vehicles." Bernatovich leased the Monte Carlo to the debtor for $250.00 per month from September, 1985, through March, 1986.

Bernatovich claims this transaction did not constitute a fraudulent conveyance because he intended that the transfer of the two vehicles be treated on the books of the debtor as additional income to him. He asserts that because the debtor never filed a 1985 tax return, there was no opportunity to reflect this transaction. He produced no other proof that such treatment was in-

---

been stolen sometime between January 1, 1986 and March 17, 1986, from the debtor's office.

**9.** The cases cited by the defendants that require proof by clear and convincing evidence all involve allegations of actual fraudulent intent, not constructive fraud. *See Patrocinio v. Yalanis*, 4 Conn.App. 33, 492 A.2d 215 (1985); *Kavarco v. T.J.E., Inc.*, 2 Conn.App. 294, 478 A.2d 257 (1984).

**10.** *Cf. Pepper v. Litton*, 308 U.S. 295, 306, 60 S.Ct. 238, 245, 84 L.Ed. 281 (1939):

A director is a fiduciary. So is a dominant or controlling stockholder.... Their dealings with the [debtor] corporation are subjected to rigorous scrutiny and where any of their contracts or engagements with the corporation is challenged the burden is on the director or stockholder not only to prove the good faith of the transaction but also to show its inherent fairness from the viewpoint of the corporation and those interested therein.

(Citations omitted.)

**11.** Bernatovich took title to the Mercedes-Benz in his own name in December, 1983 by turning in a Porsche owned by the debtor.

tended and, to the contrary, Bernatovich's 1985 tax return reflects no such income. I find that the debtor, while insolvent, received no consideration for the transfer of the two automobiles, and Bernatovich is liable to the trustee for $7,179.00 under § 548(a)(2). *See Still v. Hudson (In re Hudson),* 28 B.R. 876, 880–81 (Bankr.E.D. Tenn.1983).

### C.

On February 1, 1985, the debtor owned a 1982 Mercedes-Benz station wagon, purchased new for $31,723.50. The debtor thereafter sold the wagon to Lynn Bernatovich for $3,000.00. The trustee contends $3,000.00 was less than a reasonably equivalent value for the wagon. Mrs. Bernatovich argues that because the book value (cost minus accelerated depreciation for 30 months) of the automobile was $381.00, the debtor received more than reasonably equivalent value in the transaction.

In line with the argument advanced by the defendants in part III, *supra,* book value is not necessarily congruent with market value. This would be especially true when book value is based on accelerated depreciation. The trustee has presented sufficient evidence, pursuant to § 548(a)(2), by showing the transfer by the debtor of the Mercedes-Benz wagon to Mrs. Bernatovich, and Mrs. Bernatovich, an insider, has not proved the fairness of the transaction. *See* part IV. C., *supra.* Because the parties agreed to present this issue as to liability only, no other determination need be made at this time.

### D.

■ The debtor's bankruptcy schedules failed to show that during January, 1986, Bernatovich transferred furniture from the debtor's office to his home. The furniture had been purchased by the debtor, but Bernatovich claims his action was not improper because the furniture he removed replaced furniture that he had bought years before for the debtor's use. He claims the trustee has failed to show that the value of the removed furniture exceeded the value of the original furniture.

As an insider, Bernatovich, not the trustee, bears the burden of proof on the issue of value. *See* part IV. C., *supra.* Bernatovich introduced no proof on the value of the original furniture, either when it was bought or when it was replaced. The trustee has established a case for recovery under § 548(a)(2). This matter was also submitted only on the liability issue.

### VI.

### THE $48,640.62 TRANSACTION

In December, 1985, a series of transactions took place involving the defendants, the debtor, ATM, and two banks. The defendants, in March, 1985, had borrowed $50,000.00 from Farmington Valley Savings and Loan (FVS & L), giving FVS & L a second mortgage on their residence. The defendants loaned these funds to ATM. On December 16, 1985, the defendants caused ATM to borrow $50,000.00 from Colonial Bank (Colonial), and with that money pay off FVS & L to satisfy the defendants' debt to FVS & L. On December 20, 1985, the debtor issued a check to ATM in the amount of $48,640.62, and ATM issued a check in the same amount to Colonial in repayment of the loan ATM had taken four days earlier. Bernatovich, when he testified as part of the defendants' case, stated he believed that on December 20, 1985, the debtor owed ATM *at least* $48,640.62, and that the debtor's check represented a repayment.[12] He introduced no proof of such a debt.

The debtor's schedules list no debt to ATM and do not disclose the repayment of a debt to ATM, as would be required under paragraph 13 of the Statement of Affairs.

---

**12.** On the first day of the trial, Bernatovich had testified on this point as follows:

Q. Mr. Bernatovich, did [the debtor] owe money to ATM on that date?
A. I don't have any idea, I would have to see the books.

Q. Why was the check issued then?
A. I don't have any idea, I would have to see the books.

Bernatovich acknowledged that in December, 1985, the debtor was contemplating filing for bankruptcy. The debtor's financial statement of August 31, 1985, lists as a "current asset" the sum of $73,382.00 "due *from* affiliate" (emphasis added). Carney testified the affiliate was ATM. In a tax return prepared by Carney for ATM for the year ending August 31, 1985, the sum of $73,381.00 is shown as "Due to Affiliate."

■ The trustee initially attacks the transfer from the debtor to ATM as a fraudulent transfer. Under the foregoing facts, the defendants have the burden of proof on the issue of reasonably equivalent value, *see* part IV. C., *supra*. Bernatovich's summary assertion that the debtor owed ATM money on the date of the transfer, when contrasted with the available documentary evidence, is not credible. I find that Bernatovich has not established a debt was due ATM for which the debtor's check was issued, and the clear and convincing evidence is to the contrary.

Although the transfer of $48,640.62 was made to ATM, the trustee may recover that amount from the defendants as the "entit[ies] for whose benefit such transfer was made", § 550(a)(1). *See Mack v. Newton*, 737 F.2d 1343, 1357–58 (5th Cir.1984) (similar result under prior Bankruptcy Act). The net result of the transactions detailed above was to repay the defendants for money loaned to ATM, and to permit them to pay off a loan secured by a mortgage on their home. Bernatovich, as the sole stockholder of both the debtor and ATM, was in a position that enabled him to manipulate transactions between the two corporations for the defendants' benefit. The trustee may recover $48,640.62 from the defendants. In view of the finding that there was no liability from the debtor to ATM, it is unnecessary to consider the trustee's alternate argument that the transaction constituted a preference.

## VII.

### THE BOSTON CONDOMINIUM

The debtor for a number of years had maintained an office in the Boston suburbs,

paying an approximate $450.00 monthly rental. Bernatovich believed the debtor needed a more central location. In April, 1984, the defendants purchased an office condominium in downtown Boston for $167,000.00, which they then leased to the debtor. The condominium contained sleeping quarters to save on salesmen's and Bernatovich's hotel expenses. The defendants borrowed the condominium downpayment at interest from the debtor, and obtained mortgage financing for the remainder of the purchase price. The monthly mortgage payment was slightly under $1,700.00, and the condominium fee was $147.00 per month. The debtor paid the defendants $1,700.00 per month in rent, and paid the condominium fee. A real estate salesman called by the defendants testified that this rental was at or below market value.

■ In January, 1985, with the debtor's losses increasing, Bernatovich decided that the condominium rental was too expensive for the debtor and placed the condominium on the market. The defendants sold the condominium in July, 1985 for approximately $200,000.00. The trustee claims that the defendants should be liable to the estate for all rentals paid in excess of $450.00 per month because the purchase of the condominium was solely for the benefit of the defendants.

There was no evidence introduced to show that ATM business was transacted through the office condominium, or that the defendants' personal use of the condominium was more than incidental. The rent charged for the condominium having been shown not to be excessive, I cannot find that an unfortunate business decision made by the defendants when the debtor was solvent imposes liability on the defendants.

## VIII.

### THE LOCK SHOP EQUIPMENT

■ On the date of the petition, certain "lock shop" equipment, comprising key machine parts, locks, time combinations, key blanks, drill presses, sanders, grinders, and

a welder, was located on the debtor's premises. Subsequent to that time, while the debtor was operating as a chapter 11 debtor-in-possession, this equipment was either lost, stolen, or sold. The trustee contends that the defendants are liable for the value of this property for breach of their fiduciary duties as persons in control of a debtor-in-possession.

Bernatovich testified that several items in the lock shop belonged to third parties and that the welder was sold for $300.00 in the ordinary course of business. The defendants deny they should be liable for lost or stolen property without any evidence of culpability on their part. The West Hartford Police Department's records disclose that on March 17, 1986, Bernatovich complained that many items had disappeared from the company's premises since the first of the year. He gave the police officer a list of employees who had recently left the company. I conclude that the trustee has not sustained his burden of proof in this instance.

## IX.

### THE SET-OFF

The debtor's August 31, 1985, financial statement indicates Bernatovich was then indebted to the debtor for $10,596.80. On September 24, 1985, Bernatovich lent the debtor $20,000.00, and on November 15, 1985, both defendants lent the debtor an additional $7,800.00. A resolution in the debtor's corporate minutes book, dated November 15, 1985, purports to set off the $10,596.80 debt against the $27,800.00 in loans. That resolution provided in part:

due to adverse business conditions, the advance of Twenty-seven Thousand Eight Hundred Dollars ($27,800.00) from stockholders and directors' Notes dated September 24, 1985 (9–24–85) and November 15, 1985 (11–15–85) be used to offset all stockholder and directors' loans and the balance be paid, upon demand, with an interest rate of no more than one per cent (1%) above prime.

The trustee claims that no prepetition setoff was effected because the debtor's

schedules, prepared under Bernatovich's direction, show a debt due the defendants of $27,800.00, and the defendants have filed a proof of claim for that amount. The trustee has not advanced any persuasive reason why the incorrect schedules or the erroneous proof of claim nullify the corporate resolution. I conclude the $10,596.80 is not due to the debtor, having been offset prepetition. *See* 11 U.S.C. § 553(a) (Code does not affect right of creditor to offset mutual prepetition debts).

## X.

### USE OF CASH COLLATERAL AND POSTPETITION TRANSFERS

When the debtor filed its chapter 11 petition on January 31, 1986, the Colonial Bank held a security interest in the debtor's inventory and accounts receivable to secure an approximate debt of $50,000.00. Michael S. Schenker, Esq., the debtor's attorney, erroneously advised Bernatovich that use of cash collateral by the debtor was permissible without consent of Colonial as long as such use was in the ordinary course of business. Schenker testified that on February 12, 1986 he had talked to David W. Collins, Esq., Colonial's attorney, about matters involving the debtor's business operation, including the completion of a job for Colonial, but that they had not discussed the debtor's use of cash collateral.

Section 363(c)(2) provides:

The trustee may not use, sell, or lease cash collateral under paragraph (1) of this subsection unless—

(A) each entity that has an interest in such cash collateral consents; or

(B) the court, after notice and a hearing, authorizes such use, sale, or lease in accordance with the provisions of this section.

From January 31, 1986, to March 21, 1986, the date on which Neal Ossen became trustee, the debtor continued to operate, primarily completing contracts and collecting prepetition accounts receivable. The

debtor made no new sales. The parties have stipulated that "checks in the aggregate amount of $128,267.85 were issued by the debtor and paid with funds of the debtor's estate." During this same period, the debtor collected prepetition accounts receivable totaling $96,129.26, and the defendants took combined salaries and expense reimbursement totalling $24,710.61.

During the § 341 creditors' meeting, held on March 4, 1986, Bernatovich advised that the debtor had collected $79,000.00 of prepetition receivables, but that the debtor had only $30,000.00 cash on hand. Collins reminded the defendants and Schenker that cash collateral could not be used without Colonial's consent or an order of the court. Collins was then told that a payroll was due on the following Friday for two servicemen and the secretary. Collins authorized Bernatovich to use the sum of $1,500.00 solely for the purpose of paying those three persons, and not for any payments to the defendants. The defendants deny that they ever heard Collins make such a statement.

Following the conversion of the case to chapter 7, the trustee and Colonial did not agree on the amount of Colonial's secured claim. As part of the settlement of that dispute, Colonial assigned to the trustee all of its rights concerning the unauthorized use of cash collateral. The trustee contends that the defendants, having caused the debtor to use cash collateral of $128,-267.85 without the consent of the secured creditor or without the authorization of the court, are liable to the estate for such amount.

The defendants in their post-trial brief contend that they had "clear and direct" consent from Colonial to use the cash collateral, and that Collins's testimony to the contrary is "clearly self-serving".

■ I credit Collins's testimony that there was no express consent to the use of the cash collateral. On the other hand, Colonial was on notice by February 12, 1986, that the debtor must have been using the bank's cash collateral to continue its business, but Colonial did nothing. The court, upon Colonial's motion, could have prohibited further use of cash collateral, and possibly compensated it for any losses it had then suffered. *See, e.g., Mercantile Nat'l Bank v. Aerosmith Denton Corp. (In re Aerosmith Denton Corp.)*, 36 B.R. 116, 119–20 (Bankr.N.D.Tex.1983) (secured creditor granted replacement lien on property of debtor-in-possession). But a secured creditor on notice may not choose to ignore unauthorized use of cash collateral until a chapter 11 case is converted and then seek to recover damages for all of the funds so misused.

Of greater significance is the fact that on the record made, I am unable to locate evidence that Colonial suffered any loss as a result of the unauthorized use of the cash collateral. A violation of § 363(c)(2) which causes no loss to a secured creditor does not otherwise impose liability on the violators.

■ In the alternative, the trustee attacks the defendants' drawing of their postpetition salaries as an unauthorized transfer of estate property. The defendants received $24,710.61 in salary and expense reimbursements for the seven weeks between the petition and the appointment of a trustee.

Section 549(a) provides for avoidance of unauthorized postpetition transactions, and states in part:

> [T]he trustee may avoid a transfer of property of the estate—
>
> (1) made after the commencement of the case; and
>
> (2) . . . (B) that is not authorized under this title or by the court.

Bankruptcy Rule 6001 provides that "[a]ny entity asserting the validity of a postpetition transaction under § 549 shall have the burden of proof."

The trustee's position that the defendants' postpetition salary and expense reimbursements were excessive is clearly correct. Bernatovich's supervisory duties

were sharply reduced during that period, as the debtor's staff had been reduced to three employees. No sales were made postpetition; the debtor merely finished contracts and collected prepetition accounts receivable. The debtor continued to sustain losses during this period. Nevertheless, Bernatovich maintained a level of salary and expenses ($20,371.00 for seven weeks) that exceeded $2,900.00 per week. Mrs. Bernatovich, who was not normally on the payroll as an employee, received an additional $4,339.61. Seventy-five percent of these amounts is voidable by the trustee under § 549(a). The trustee may recover $15,278.25 from Bernatovich and $3,254.70 from Mrs. Bernatovich under § 550(a) as unauthorized postpetition transfers. *Compare In re Lyon & Reboli, Inc.*, 24 B.R. 152 (Bankr.E.D.N.Y.1982) (court has power under § 105 to reduce salaries of officers of debtor that is a closely-held corporation).

## XI.

## DIRECTOR'S FEE

In December, 1985, a month prior to the filing, Bernatovich caused the debtor to pay Lynn Bernatovich a director's fee of $4,000.00. Bernatovich testified that it was the debtor's regular annual practice to pay his wife this amount as a director's fee, and that, in fact, her services to the debtor during 1985 were worth considerably more. The trustee claims that this payment constitutes a preference under Code § 547. Mrs. Bernatovich argues that the payment did not result in a preferential treatment to her because there is no proof she received more than she would as a creditor in this case, *see* § 547(b)(5), and that the payment was within the ordinary course of business exception of § 547(c)(2).

Mrs. Bernatovich's first contention is not well-founded. The court has found that the estate was insolvent when the petition was filed, and that is sufficient to satisfy the preferential treatment standard of § 547(b)(5). "[A]s long as the distribution in bankruptcy is less than one-hundred per-

cent, *any* payment ... to an unsecured creditor during the preference period will enable that creditor to receive more than he would have received in liquidation had the payment not been made." *Elliot v. Frontier Properties/LP (In re Lewis W. Shurtleff, Inc.)*, 778 F.2d 1416, 1421 (9th Cir.1985) (emphasis in original).

Mrs. Bernatovich then claims that the director's fee was paid in the ordinary course of business and is therefore protected under § 547(c)(2). That section protects any transfer to the extent it was a payment of a debt incurred and paid in the ordinary course of business of the debtor according to ordinary business terms. "The purpose of this exception is to leave undisturbed normal financial relations...." H.R.Rep. No. 595, 95th Cong., 1st Sess. 373, *reprinted in* 1978 U.S.Code Cong. & Ad.News 5787, 5963, 6329.

I conclude that under the facts of this proceeding, when a $4,000.00 fee for yearlong director duties is paid to an insider in the month prior to the filing of a bankruptcy petition while the debtor is insolvent, such payment does not come within the § 547(c)(2) exception. Accordingly, the trustee may recover the $4,000.00 from Lynn Bernatovich.

## XII.

## CORPORATE OPPORTUNITIES

The trustee attacks two transactions—the purchase of the Boston condominium and the purchase of a Mercedes-Benz automobile—as improper diversions of corporate opportunities by the defendants for their own benefit. The trustee seeks to recover the profits which the defendants made when they sold the condominium and the automobile, citing *Pacelli Bros. Transp., Inc. v. Pacelli*, 189 Conn. 401, 407, 456 A.2d 325 (1983) ("An officer and director occupies a fiduciary relationship to the corporation.... He occupies a position of the highest trust and therefore he is bound to use the utmost good faith and fair dealing in all his relationships with

the corporation.") (citations omitted); *Katz Corp. v. T.H. Canty & Co.*, 168 Conn. 201, 208–09, 362 A.2d 975 (1975) ("[O]ne who occupies a fiduciary relationship to a corporation may not acquire, in opposition to the corporation, property in which the corporation has an interest or tangible expectancy").

I conclude these transactions are immune from the trustee's objections because both purchases occurred prior to May, 1984, at times when the debtor was solvent. *Compare Unsecured Creditors Committee v. Noyes (In re STN Enterprises)*, 779 F.2d 901, 904 (2d Cir.1985) ("in most states, directors of a *solvent* corporation do not owe a fiduciary duty to creditors") (emphasis in original). In addition, the debtor was not in the business of acquiring realty or automobiles. Therefore, judgment may enter for the defendants on these two matters.

## XIII.

### SUMMARY

The trustee has established fraudulent transfers alleged in Counts Two, Three, Four, Five, Six, and Thirteen of his complaint amounting to $103,221.01 as to Anthony Bernatovich, and $48,640.62 as to Anthony Bernatovich and Lynn Bernatovich. In addition, the trustee established a preferential transfer of $4,000.00 as to Lynn Bernatovich under Count Eight, and unauthorized postpetition transfers under Count Fourteen of $15,278.25 as to Anthony Bernatovich and $3,254.70 as to Lynn Bernatovich. Therefore, for the reasons stated, the trustee may recover from Anthony Bernatovich $118,499.26, from Lynn Bernatovich $7,254.70, and from both defendants jointly $48,640.62, plus interest on all amounts from the date of the complaint. As to the matters of the Mercedes-Benz wagon and the office furniture contained in Counts Seven and Nine, tried as to liability only by agreement of the parties, the trustee has proved liability, and upon application a hearing shall be set to establish damages. Counts One, Ten, Eleven, Twelve, Fifteen, Sixteen, and Seventeen of the complaint are dismissed on the merits.