In re COLONIAL REALTY COMPANY, Jonathan Googel, Benjamin Sisti, Debtors.

Hal M. HIRSCH, As Trustee of the Consolidated Estates of Colonial Realty Company, Jonathan Googel, and Benjamin Sisti, Debtors, Plaintiff,

v.

Gerald STEINBERG, Robert Simons, Barbara Simons, Sharon Simons, Harris Simons, and Bruce Simons, Defendants.

Bankruptcy No. 90–21980.

Adversary No. 96–2255.

United States Bankruptcy Court, D. Connecticut.

Sept. 9, 1998.

David M. Pollack, Eric H. Lindenman, and Howard P. Magaliff, Gainsburg & Hirsch LLP, New York City, for plaintiff.

Richard P. Weinstein, Weinstein & Wisser, P.C., West Hartford, CT, for Gerald Steinberg.

Mark B. Seiger, Edwards & Angell, Hartford, CT, for Gerald Steinberg, Robert Simons, Barbara Simons, Sharon Simons, Harris Simons and Bruce Simons.

## MEMORANDUM OF DECISION

ROBERT L. KRECHEVSKY, Bankruptcy Judge.

### I.

### ISSUE

In this adversary proceeding, which consumed six trial days, Hal M. Hirsch ("the trustee"), trustee of the consolidated estates of Colonial Realty Company ("Colonial"), Jonathan Googel ("Googel"), and Benjamin Sisti ("Sisti") (together, "the debtors"), primarily contends that transfers of certain corporate stock by Googel and Sisti to Gerald Steinberg ("Steinberg") and Robert Simons ("Simons") constituted fraudulent transfers under Bankruptcy Code § 548(a).[1] The trustee asserts the transfers involved both actual and constructive fraud, and in his complaint, filed on November 12, 1996, seeks to recover the posttransfer appreciated value of the stock, interest, costs, and attorneys' fees. Steinberg and Simons, plus subsequent transferees from Simons, to wit, Barbara Simons, Sharon Simons, Harris Simons, and Bruce Simons (together, "the defendants"), claim that the trustee, at trial, failed to establish any actual fraud, that the transfers were arms-length transactions in which Googel and Sisti received reasonably equivalent value, and that awardable damages, if any, should not exceed that required to restore the debtors' estates to their pretransfer condition.

---

1. This proceeding constitutes a core proceeding under 28 U.S.C. § 157(b)(2)(H) ("proceedings to determine, avoid, or recover fraudulent conveyances").

## II.

### BACKGROUND

#### A.

Googel and Sisti were the founding partners of Colonial, a Connecticut general partnership, which, by the mid–1980's, was the owner and operator of many major properties and the syndicator of real estate limited partnerships throughout the United States. Steinberg and Simons were also significant real estate investors and, in the early 1980s, had become partners with Googel and Sisti to develop both a 900–plus unit apartment complex in Rocky Hill, Connecticut and a hotel located near the John F. Kennedy International Airport in New York.

Simons, prior to 1985, had arranged financing to establish outpatient surgical centers nationwide as a principal in Medical Management and Development Corporation ("MMDC"). In July 1985, MMDC required financing for two Connecticut outpatient surgical centers—one in Danbury, Danbury Surgical Center, Inc. ("DSC"), and the other in Bridgeport, Bridgeport Surgical Center, Inc. ("BSC") (together, "the centers"). Simons approached Googel and Sisti for assistance in securing commercial financing for the centers. The parties agreed that in return for Googel and Sisti utilizing their contacts to obtain a $5,000,000 line of credit from Merrill Lynch Private Capital, Inc. ("Merrill Lynch"), Googel and Sisti would each receive 4,019 shares, or 13.13%, of the stock of DSC and 157 shares, or 15.71%, of the stock of BSC (the "stock").

Simultaneously with their acquisition of the stock in July–September 1985, Googel and Sisti entered into a "Shareholders' Agreement" and "Voting Trust Agreement" for each of the centers. The DSC shareholders, in addition to Googel and Sisti, with their 4,019 shares apiece, were Simons (6,715 shares), Steinberg (4,466 shares), Frank M. Shuch ("Shuch"), a non-founding Colonial partner, (893 shares), Bernard A. Kershner ("Kershner") (5,250 shares), Allen D. Hecht ("Hecht") (3,750 shares), and Anthony J. Morris ("Morris") (1,500 shares). The shareholders in BSC were Googel and Sisti, with 157 shares each, Simons (175 shares), Stein-

berg (175 shares), Shuch (36 shares), Kershner (175 shares), and Hecht (126 shares). These shareholders, according to the Shareholders' Agreements, owned all of the centers' outstanding stock. The Shareholders' Agreements restricted transfer of the stock by requiring a shareholder, before transferring any shares, to obtain the prior written consent of all other shareholders or offer the center a right of first refusal. Upon the death of a shareholder, each center agreed to purchase the stock from the deceased shareholder's estate at a price to be determined by "competent appraisal." Morris, with the other shareholders' unanimous consent, sold his 1,500 shares of DSC stock to DSC for $15,-000 in July of 1989.

Simons, Steinberg, Googel, Sisti, and Shuch were the sole parties to the Voting Trust Agreements, which made Simons trustee for these shareholders for a term of ten years. Simons, as trustee, was granted the exclusive right to vote such shares for all purposes. Googel and Sisti, however, received monthly financial statements of the centers' operations during the period of their stock ownership.

In July, 1986, the Merrill Lynch financing was replaced with $8,600,000 in financing received from The Connecticut Bank and Trust Company, N.A. ("CBT"). Googel and Sisti, along with Steinberg, Simons, and Shuch, signed personally as co-makers on the notes evidencing the monies owed CBT (the "CBT notes" and "CBT debt"). Each CBT note provided that a default would occur if, over the term of the note, more than 10% of a center's stock was cumulatively transferred to a person who was not a shareholder or guarantor of the note, or if Kershner or any two other makers died. The notes required progressively larger principal payments over time and included an "earnings recapture" provision requiring each center to pay CBT 50% of its net income, in addition to principal and interest.

In late 1989 and early 1990, Colonial began experiencing financial difficulties as real estate prices fell and lenders demanded payment on defaulted loans. As general partners, Googel and Sisti were personally liable on all of Colonial's obligations. CBT, to

which the debtors were liable for $40,000,000 to $60,000,000, demanded repayment of its debt during the last week of 1989. The *Hartford Courant*, on September 7, 1990, ran an article headlined "Decline Troubles Colonial: Real Estate Giant Facing Mounting Money Problems." On September 14, 1990, several bank creditors, including CBT, filed separate involuntary bankruptcy petitions against Colonial, Googel, and Sisti, and the trustee was subsequently appointed trustee of the present Chapter 7 consolidated estates. These estates involved thousands of parties and billions of dollars of debt. *See In re Colonial Realty Co.*, 980 F.2d 125, 127 (2d Cir.1992) ("Thousands of Colonial investors suffered significant losses in connection with the Colonial collapse, and claims filed by all creditors total billions of dollars. Shortly after the fall of Colonial, many of the banks that had loaned money to the Debtors and the limited partnerships also failed.").

### B.

On September 8, 1990, six days before the involuntary petitions were filed and the day after the *Hartford Courant* article appeared, Googel and Sisti conveyed their stock in the centers to Steinberg and Simons for the total sum of $100,000 (the "transfer"). The parties dispute who initiated the transfer and the circumstances surrounding the transfer. Googel[2] testified that Steinberg came to Googel's office in West Hartford, Connecticut on September 7 or September 8, 1990 and suggested that Googel and Sisti sell their stock in the centers to Steinberg and Simons so that the centers would not become involved with the debtors' financial problems. Steinberg, according to Googel, stated that he and Simons would pay $100,000 on transfer and, when the debtors' troubles were over, they would "straighten out with" Googel and Sisti and pay them what the stock was really worth. Googel testified that he and Sisti agreed without having any idea of what the stock was worth.

On September 8, 1990, these four parties executed a Stock Purchase Agreement (the

"Agreement") dated September 8, 1990 and drafted by Joseph A. Vitale, Esq. ("Vitale"), Steinberg's and Simons' attorney. Article III of the Agreement, entitled "Purchase Price and Payment," stated that "[i]n consideration for the Stock to be received by Simons and Steinberg, Simons and Steinberg shall pay the Sellers the aggregate sum of One Hundred Thousand Dollars ($100,000.00) in cash at the closing." No other consideration was mentioned. Article VI, Section 6.1, entitled "Entire Agreement," provided "[t]his Agreement contains the entire understanding of the parties. There are no oral understandings, terms or conditions, and no party has relied upon any representation, express or implied, not contained in this Agreement." Googel testified that the same day the Agreement was executed, or the day after, Steinberg brought Googel four checks, all dated September 8, 1990—two $25,000 checks Simons had written to Googel and two $25,000 checks Steinberg had written to Sisti. The memo notation on the Simons checks stated "Bridgeport & Danbury Surgical Centers." The Steinberg checks stated "[f]ull pymt for Danbury & Bridgeport Surg. Ctrs."

Steinberg denied any such conversation occurred as described by Googel. He testified that Googel, during the summer of 1990, initiated discussions for a buyout of the Googel and Sisti interests in the centers, and those negotiations concluded on September 8, 1990 with the execution of the Agreement. Simons testified in like fashion. Steinberg and Simons denied any knowledge of the debtors' serious financial problems on the date of the transfer. Vitale testified he drafted the Agreement at Steinberg's request, beginning the work before September 5, 1990 and completing the final draft on that date.

Steinberg and Simons also testified that releasing Googel and Sisti from the CBT debt was the *primary* consideration for the transfer. Steinberg and Simons each paid CBT a $20,809 fee to secure such release. In a letter dated September 13, 1990, the day

2. Googel testified by videotape, due to his present incarceration in a federal prison. He pled guilty in 1993 to various counts of wire fraud, bank fraud, and impeding administration of Internal Revenue Service laws. Googel and Sisti did not receive discharges from debt in their individual bankruptcy cases.

before CBT joined in the filing of the involuntary bankruptcy petitions against the debtors and approximately five days after the transfer, CBT, for $41,618, a fee equal to .05% of the outstanding balance of all loans, agreed to release Googel and Sisti from the CBT debt. CBT also agreed to release Shuch from the debt, although Shuch's stock was not included in the transfer. CBT's September 13, 1990 letter did not mention the transfer or the Agreement and was addressed solely to Simons. Vitale testified that around the time that he prepared the Agreement, either Shuch or Sisti[3] telephoned and told him that as a condition of the transfer, Googel and Sisti were to be released from their debt in connection with DSC and BSC. Vitale said that he called Paul Kennelly ("Kennelly"), a banker at CBT, to explain the pending transfer and request that Googel and Sisti be released. Kennelly told him that others had contacted him and that he understood that Googel and Sisti were being released. Googel stated that he was not aware that he had been released from the CBT debt, that neither he nor Sisti requested such release, and that it was not part of any consideration for the stock transfers.

On or about November 6, 1990, Simons gifted beneficial interests in some of his stock in the centers to family members Barbara Simons, Sharon Simons, Harris Simons, and Bruce Simons. On October 14, 1992, Simons, Barbara Simons, Sharon Simons, Harris Simons, Bruce Simons, Kershner, and Hecht (the "sellers") sold MMDC and its affiliates to The Mediplex Group, Inc. ("Mediplex"), a public company that owned and operated nursing and convalescent homes in the northeast (the "Mediplex transaction"). Mediplex acquired all of the interests owned by MMDC's founders, including their interests in DSC, BSC, and three other Connecticut surgical centers; all of MMDC's stock; and MMDC's rights to receive management fees from centers in which it did not have an equity interest. The purchase price was $17,426,225 in cash and notes at closing, plus deferred cash payments, assumption of debt, and options to Kerschner and Hecht to pur-

chase shares in Mediplex. The Purchase Agreement executed by Mediplex and the sellers (the "Mediplex Agreement") allocated $8,000,000 of the purchase price to DSC and $3,250,000 to BSC. Steinberg, on October 13 or October 14, 1992, had sold his 8,485 shares in DSC and 332 shares in BSC to Hecht, Kershner, and Simons for $1,470,226 in a transfer that was contingent upon consummation of the Mediplex transaction.

### C.

The parties agree that Googel's and Sisti's stock in BSC was worth little or nothing in September, 1990, but dispute the value of the DSC stock on the date of the transfer. To establish such value, the trustee provided expert valuation testimony from Christopher Rahne ("Rahne"), a certified public accountant, chartered financial analyst, and senior manager, specializing in health care, in the valuation group at BDO Seidman, LLP, an accounting and consulting firm. Rahne used the "discounted net cash flow" approach to value the stock, which involved forecasting future revenues and expenses associated with each center, using the forecasts to estimate the centers' net cash flow, discounting net cash flow to present value, and discounting the centers' residual values—the future values of their assets—to present value. Rahne testified that the present value of net cash flow plus the present value of the residual represented a center's "business enterprise value."

Rahne projected net cash flows for three years, basing his projections on the centers' then-current and historical financial positions and operating results. Using the industry average capital structure of 24% debt and 76% equity, he computed a discount rate— the rate of return an investor would demand in order to invest in the centers—of 17.5%. Applying the discount rate to the projected cash flows and residual values, Rahne determined that DSC's and BSC's business enterprise values, in September, 1990, were $7,124,000 and $5,544,000, respectively. From these values, he subtracted the cen-

---

**3.** Vitale testified that he received the telephone call between September 5, 1990 and the date the release was secured from CBT. He could not remember whether Shuch or Sisti was the caller, but was certain that the caller was not Googel.

ters' interest-bearing debt, $3,798,000 for DSC and $5,361,000 for BSC, resulting in equity values of $3,326,000 for DSC and $183,000 for BSC. He then took a 20% discount for lack of marketability, to account for the fact that the centers' stock lacked a ready market because it was not registered or publicly traded, and an additional 5% discount for restrictions on voting rights, to account for the voting trusts. According to Rahne, these discounts yielded "fair market values" of $2,528,000 for DSC and $137,250 for BSC. After applying Googel's and Sisti's ownership percentages to the centers' fair market values, Rahne concluded that Googel's and Sisti's individual interests in DSC were each worth $349,100 in September, 1990.[4] Rahne conceded that Googel's and Sisti's interests in BSC were of little or no value.

Rahne tested his discounted net cash flow valuations by comparing the centers to publicly traded surgical centers and to comparable centers that were acquired within a reasonable period prior to the valuation date. The business enterprise values derived from these alternative approaches verified the values derived from the discounted net cash flow approach. Rahne testified that he relied essentially on the discounted net cash flow valuations for his ultimate opinion on the fair market value of the stock.

The defendants presented Charles E. Coyne ("Coyne"), a senior appraiser with and part owner of Valuation & Financial Strategies, LLC, as their valuation expert. Coyne, who has approximately ten years of experience valuing closely held businesses, did not independently appraise the centers and limited his testimony to a critical review of Rahne's appraisal.

Coyne criticized Rahne's valuation in three main areas.[5] See Def.'s Exh. M. First, he said that Rahne erred in failing to fully consider the impact of the Connecticut economy, which Coyne said was in a "deep slump," expected to continue for one to seven years, in September, 1990. According to Coyne, potential investors in the centers would have required a higher rate of return than the 17.5% utilized by Rahne, to compensate for the greater perceived risks associated with an investment in a Connecticut outpatient surgical center. These risks included a high unemployment rate, which would create a large uninsured population, and a poor commercial banking environment and soft commercial real estate market, which would reduce business' ability to finance growth.

Second, Coyne stated that the discount rate and weighted average cost of capital Rahne used did not account for the "unsystematic risks"—the risks that are specific to an investment and cannot be reduced by diversification—associated with valuing the future cash flows of a small, privately owned, highly leveraged business. Coyne added a 5% "specific company risk adjustment" to the cost of equity Rahne had used in calculating the discount rate. Increasing the cost of equity by 5% had the effect of increasing the discount rate from 17.5% to 21.5%. Coyne concurred with Rahne's choice of the discounted net cash flow method of valuation and accepted his three-year cash flow projections.

Third, Coyne questioned Rahne's selection of a 20% discount for lack of marketability. Coyne summarized a number of studies quantifying the discounts applied to restricted securities of publicly traded companies[6] and the discounts in private transactions that

---

4. Rahne's calculation assumed that Googel and Sisti each owned 13.81% of DSC. According to the Schedule of Stock Ownership for DSC dated August 1, 1995 and entered by the trustee as a full exhibit, Googel and Sisti each owned 4,019 shares out of a total of 30,612 shares outstanding. See Pl.'s Exh. 81. Thus, Googel and Sisti each owned 13.13% of DSC, worth $331,926 in September, 1990, under Rahne's calculation.

5. In addition to his primary criticisms, Coyne stated that Rahne should have used the centers' actual capital structure of 25% debt and 75% equity instead of the industry average capital

structure of 24% debt and 76% equity, because a purchaser of Googel's and Sisti's minority interests could not have changed the centers' capital structures. Coyne further noted that Rahne's projected cash flows assumed that the centers would be taxed as C corporations, while the centers were S corporations, another factor that minority shareholders could not change. The court does not find these criticisms significant.

6. Restricted stock is stock that is not registered under the 1933 Securities Act and the resale of which is restricted.

preceded initial public offerings. These discounts ranged from 24% to 45% for restricted stock and 49% to 53% for private stock transactions. Based on these studies, Coyne concluded that a 35% discount for lack of marketability was appropriate. He concurred with Rahne's 5% discount for the voting restrictions.

Using a 21.5% discount rate and applying a 35% discount for lack of marketability followed by a 5% discount for the voting restrictions, Coyne concluded that Googel's and Sisti's interests in DSC were worth $252,000, or $126,000 per person, in September, 1990.[7] Googel's and Sisti's 15.68% interest in BSC, according to Coyne, was worthless on that date. Coyne further stated that if a purchaser of Googel's and Sisti's minority interests was required to assume the centers' debt, the investment would be so risky that it would be unreasonable to expect anyone to buy the interests.

The defendants presented a second valuation expert, Timothy J. Floyd ("Floyd"), who testified that provisions in the CBT notes would reduce the values of Googel's and Sisti's minority interests. Floyd stated that no public buyer would want to purchase a minority interest in one of the centers because a minority shareholder could not control management or financing and a public company with only a minority interest would not realize economies of scale regarding expenses. In Floyd's opinion, Googel and Sisti received "more than adequate consideration" for their minority, nonvoting interests because both centers had negative net worth

and both "had financing that had to be accepted on its face."

Simons testified that in his opinion, Googel and Sisti received a fair price for the stock. He said he was "shocked" that he and Steinberg had to pay $100,000 because "their being taken off the bank notes was a compelling factor." Kerschner stated that $100,000 was not an "unreasonable" or "unrealistic" amount for Googel and Sisti to receive for their interests in DSC and BSC, given the centers' histories of financial struggle. According to Steinberg, Googel's and Sisti's interests in the centers were worthless in September, 1990. Hecht likewise said that the interests were worthless.

The trustee introduced into evidence Simons' personal "Statement of Financial Position," prepared by his accountants, Prince & Prince, for distribution to banks and other financial institutions. Simons claimed in the unaudited statement that as of September 30, 1990 his 22.5% interest in DSC was worth $335,000 and his 17.5% interest in BSC was worth $105,000.

The defendants have conceded that Googel and Sisti were insolvent on the date of the transfer, although they deny having had such knowledge before the transfer.

### III.

### ARGUMENTS OF THE PARTIES

The trustee asserts that he is entitled to avoid the transfer pursuant to § 548(a)(1) of the Bankruptcy Code[8] because Googel and Sisti transferred the stock with an actual

---

7. Coyne, like Rahne, assumed that Googel and Sisti each owned 13.81% of DSC.

8. Section 548(a) of the Bankruptcy Code provides that:

The trustee may avoid any transfer of an interest of the debtor in property, or any obligation incurred by the debtor, that was made or incurred on or within one year before the date of the filing of the petition, if the debtor voluntarily or involuntarily—

(1) made such transfer or incurred such obligation with actual intent to hinder, delay, or defraud any entity to which the debtor was or became, on or after the date that such transfer was made or such obligation was incurred, indebted; or

(2)(A) received less than a reasonably equivalent value in exchange for such transfer or obligation; and

(B)(i) was insolvent on the date that such transfer was made or such obligation was incurred, or became insolvent as a result of such transfer or obligation;

(ii) was engaged in business or a transaction, or was about to engage in business or a transaction, for which any property remaining with the debtor was an unreasonably small capital; or

(iii) intended to incur, or believed that the debtor would incur, debts that would be beyond the debtor's ability to pay as such debts matured.

11 U.S.C. § 548(a).

intent to hinder, delay, and/or defraud their creditors by placing the stock beyond their reach. The trustee claims that Googel and Sisti never intended to transfer the stock because they considered their investments in DSC and BSC to be long-term investments, and did so only because Steinberg and Simons promised them that after their financial troubles were resolved, Steinberg and Simons would reconvey[9] the stock or its true value. Additionally, the trustee alleges that other "badges of fraud" existed: that Googel and Sisti were insolvent at the time of the transfer, their financial difficulties were well known to the Hartford business community, the transfer was not an arms-length transaction but a sale to insiders, the transfer occurred while creditors were actively pursuing Googel and Sisti, and Googel and Sisti received less than adequate consideration for their stock.

■ Alternatively, with respect to DSC only, the trustee contends that he may avoid the transfer pursuant to § 548(a)(2) of the Code because Googel and Sisti received less than reasonably equivalent value for the stock while they were insolvent. The trustee relies on the expert testimony that Googel's and Sisti's interests in DSC as of September, 1990 were worth $698,200, or $349,100 per person, far more than the $100,000 they jointly received. The trustee denies that the release of Googel and Sisti from the CBT debt was a consideration for the transfer of the stock.[10]

As to the measure of recovery, the trustee, in his complaint, seeks to recover $3,018,042 from Simons and $646,348 from Steinberg, plus interest. Although the complaint does not expressly so state, these values apparently reflect those portions of the proceeds of, respectively, Simons' sale of his DSC and BSC stock to Mediplex and Steinberg's sale of his stock to Simons, Kershner, and Hecht

that the trustee alleges are attributable to the shares Googel and Sisti transferred, less the $100,000 consideration they received. The trustee also asserts that Googel's and Sisti's transfer with intent to recover the stock or its value created a constructive trust, that Steinberg and Simons were not free to dispose of or transfer the stock because they held it in trust for Googel and Sisti, and that the defendants would be unjustly enriched if permitted to retain the appreciated value of the stock.

The defendants argue that the trustee has not offered any evidence, other than Googel's testimony, of an agreement to reconvey or pay additional consideration for the stock. With regard to constructive fraud, the defendants assert that Googel and Sisti received reasonably equivalent value for the stock, and that the trustee's expert's testimony should not be credited because he failed to consider "the adverse effect that principal repayment terms, stock transfer restrictions and other default provisions in the CBT notes would have had on the fair, salable value of Googel/Sisti's minority stock interests." *Def.'s Reply Brief* at 23. Moreover, the defendants contend that Googel's and Sisti's release from the CBT debt was "an essential component of the stock sale." *Id.* at 26.

The defendants state that the trustee's claim of a constructive trust and unjust enrichment must fail because the trustee did not prove that Steinberg and Simons agreed to reconvey the stock to Googel and Sisti. The defendants claim that the transfer was arms-length and that Steinberg and Simons had no intent to, or knowledge of an intent to, hinder, delay, or defraud creditors.

With respect to the measure of recovery, the defendants contend that recovery under § 550(a), if allowed, should restore the debtors' estate to the financial condition it would

---

9. Although the trustee, in his brief, refers to an alleged agreement to reconvey the stock, Googel, in his videotape testimony, never specifically stated that Steinberg and Simons promised to "reconvey" the stock.

10. The trustee, in his complaint, also alleges that pursuant to Bankruptcy Code § 544, he succeeds to the rights of Googel's and Sisti's creditors to

avoid the transfer under applicable state law; that a creditor holds an allowed unsecured claim against Googel and Sisti that arose prior to the transfer; and that the transfer was fraudulent under Conn.Gen.Stat. § 52–552 (repealed), Connecticut's fraudulent conveyance statute. The trustee did not brief this claim and it is deemed abandoned.

have been in had the transfer not occurred. The defendants claim that basing recovery on the allocation that Mediplex assigned to DSC and BSC is misplaced because the Mediplex transaction took place more than two years after the transfer, included other surgical centers in addition to DSC and BSC, and was structured to allow Mediplex to receive favorable tax treatment on its acquisition.

## IV.

### DISCUSSION

#### A.

#### ACTUAL FRAUD

The trustee bears the burden of establishing every element of a voidable transfer under § 548 of the Bankruptcy Code. *See Rubin v. Mfrs. Hanover Trust Co.,* 661 F.2d 979, 993 (2d Cir.1981); *Ossen v. Bernatovich (In re Nat'l Safe Northeast, Inc.),* 76 B.R. 896, 901 (Bankr.D.Conn.1987). Although courts disagree whether actual fraud under § 548(a)(1) must be proven by clear and convincing evidence, *see, e.g., Ossen,* 76 B.R. at 901, or a preponderance of the evidence, *see, e.g.; Thompson v. Jonovich (In re Food & Fibre Protection, Ltd.),* 168 B.R. 408, 418 (Bankr.D.Ariz.1994), the parties in the instant proceeding agree that the proper standard is clear and convincing evidence.

Because actual fraud is rarely proven by direct evidence, courts infer fraudulent intent by examining the circumstances surrounding the transfer to determine whether any "badges of fraud" are present. *See, e.g., Salomon v. Kaiser (In re Kaiser),* 722 F.2d 1574, 1582 (2d Cir.1983). Badges of fraud recognized by the Second Circuit include

(1) the lack or inadequacy of consideration;

(2) the family, friendship or close associate relationship between the parties;

(3) the retention of possession, benefit or use of the property in question;

(4) the financial condition of the party sought to be charged both before and after the transaction in question;

(5) the existence or cumulative effect of a pattern or series of transactions or course of conduct after the incurring of debt, onset of financial difficulties, or pendency or threat of suits by creditors; and

(6) the general chronology of the events and transactions under inquiry.

*Id.* at 1582–83. "The presence of a single badge of fraud may spur mere suspicion; the confluence of several can constitute conclusive evidence of actual intent to defraud...." *Acequia v. Clinton (In re Acequia, Inc.),* 34 F.3d 800, 806 (9th Cir.1994), citing *Max Sugarman Funeral Home, Inc. v. A.D.B. Investors,* 926 F.2d 1248, 1254–55 (1st Cir.1991).

The court concludes that the trustee has not carried his burden of proving actual fraud under either evidentiary standard. The trustee offered no proof, other than Googel's testimony, of an agreement to reconvey or pay additional consideration for the stock. Googel's unsupported testimony is not sufficient to prevail over the denials of the other parties to the transfer and the specific language of the Agreement. Although Googel claimed that Steinberg promised to pay additional consideration for what the stock was really worth, Steinberg denied making such a promise and Simons denied agreeing to provide additional funds or authorizing Steinberg to do so. Moreover, the Agreement, which states that it is the "entire agreement." recites only consideration of $100,000. The other badges of fraud are not sufficient to permit the court to infer fraudulent intent. The trustee having failed to carry the burden of proof, the court does not find that Googel and Sisti transferred the stock with actual intent to hinder, delay, and/or defraud creditors. In the absence of actual fraud, the trustee proffers no basis for the court to find that the transfer created a constructive trust or that the defendants would be unjustly enriched if they could retain the posttransfer appreciated value of the stock.

#### B.

#### CONSTRUCTIVE FRAUD

The trustee must prove each element of constructive fraud under Code § 548(a)(2) by a preponderance of the evidence. *See, e.g., Hartvig v. Tri–City Baptist Temple of Milwaukie, Inc. (In re Gomes),*

219 B.R. 286, 291 (Bankr.D.Or.1998); *Dunbar v. Johnson (In re Grady)*, 202 B.R. 120, 123 (Bankr.N.D.Iowa 1996); *Ossen*, 76 B.R. at 901. Because the defendants concede that Googel and Sisti were insolvent at the time of the transfer, the trustee must prove that Googel and Sisti did not receive reasonably equivalent value for their stock.

"Section 548 provides no definition to guide the Court in the application of the term 'reasonably equivalent value.' Congress left to the courts the obligation of marking the scope and meaning of such term." *Cooper v. Ashley Communications, Inc. (In re Morris Communications NC, Inc.)*, 914 F.2d 458, 466 (4th Cir.1990). The appropriate time for evaluating whether reasonably equivalent value was given is the time when the transfer was made. *Id.* See also *Allard v. Flamingo Hilton (In re Chomakos)*, 69 F.3d 769, 770 (6th Cir.1995), *cert. denied*, 517 U.S. 1168, 116 S.Ct. 1568, 134 L.Ed.2d 667 (1996). Courts determine reasonable equivalence by considering all the facts of the case. *See Morris Communications*, 914 F.2d at 466–67; *Gantz v. Colonial Cent. Sav. Bank, F.S.B. (In re Gantz)*, 162 B.R. 890, 896–97 (D.Wyo.1994). Fair market value, while not dispositive, is an important element and often a starting point for determining reasonably equivalent value. *Morris Communications*, 914 F.2d at 467; *Bundles v. Baker (In re Bundles)*, 856 F.2d 815, 824 (7th Cir.1988); *McCanna v. Burke*, 197 B.R. 333, 339 (D.N.M.1996).

Based on the experts' testimony, the court concludes that Googel and Sisti did not receive reasonably equivalent value for their interests in DSC. The court notes that the Morris stock sale is some evidence to the contrary, but does not consider it significant in light of other evidence. Coyne stated that nobody would buy Googel's and Sisti's interests if a purchaser had to assume the centers' debt. Floyd likewise referred to "financing that had to be accepted on its face." Although the defendants have pointed to provisions in the CBT notes that a buyer would find unfavorable, nothing in the CBT notes or Shareholders' Agreements specifically requires a buyer to assume the CBT debt. The defendants have not persuaded the court that upon a sale of Googel's and Sisti's substantial minority interest in the centers, CBT would have enforced the default or another lender would not have refinanced the centers, and the court rejects the claim that a purchaser would have had to assume the debt.

The court generally credits Rahne's testimony. Coyne accepted Rahne's use of the discounted net cash flow approach, his projected cash flows for the centers, and his selection of a 5% discount to account for the voting trusts. Although Coyne criticized Rahne for failing to consider the state of the Connecticut economy in 1990, Rahne testified that Connecticut's 1990 recession would not have reduced the centers' value because, except for elective procedures, most surgeries would still have been performed. The recession might have increased demand for the centers' services, according to Rahne, because companies would have sought lower-cost alternatives to hospital procedures.

Coyne also criticized Rahne's methodology for failing to account for unsystematic risk and added a 5% "specific company risk adjustment" to the cost of equity Rahne had calculated, increasing the discount rate to 21.5%. The court credits Rahne's testimony that the 12.8% "equity risk premium" he used in determining the cost of equity sufficiently accounted for the risks associated with investing in DSC.

With respect to the discount for lack of marketability, the court finds Coyne's testimony persuasive and agrees that a 20% discount for lack of marketability is too small. The studies Coyne summarized, as well as other authorities,[11] suggest that 35% is an

---

11. *See Mandelbaum v. Commissioner*, 69 T.C.M. (CCH) 2852 (1995), *aff'd*, 91 F.3d 124 (3d Cir. 1996) ("Because [the petitioners' expert's ten] studies found that the average marketability discount for a public corporation's transfer of restricted stock is 35 percent, and that the average discount for IPO's is 45 percent, we use these figures as benchmarks of the marketability discount for the shares at hand."); Edwin T. Hood et al, *Valuation of Closely Held Business Interests*, 65 U.Mo.Kan.City L.Rev. 399, 439–40 (1997) (citing J. Michael Maher, *Discounts for Lack of Marketability for Closely Held Business Interests*, 54 TAXES 562, 571 (1976)) ("The similarity between the market conditions for restricted stock and stock in a closely held corporation suggests that

appropriate discount for lack of marketability. Applying a 35% discount for lack of marketability followed by a 5% discount for the voting trust to Rahne's calculated equity value of $3,326,000 for DSC, the court concludes that Googel's and Sisti's 13.13% interests were worth $539,329 combined, or $269,665 per person.

Other evidence supports the court's conclusion that Googel and Sisti did not receive reasonably equivalent value for their interests in DSC. Simons, in his September 30, 1990, Statement of Financial Position, valued his 22.5% interest in DSC at $335,000. Under Simons' valuation, Googel's and Sisti's 13.13% interests were each worth $195,491 in September of 1990. Likewise, the 1992 Mediplex transaction belies the defendants' claim that they gave reasonably equivalent value. Regardless of whether the allocation of sale proceeds in the Mediplex Agreement is accepted at face value, that is, that Googel's and Sisti's interests in DSC alone were worth more than $3,000,000 on October 14, 1992, the Mediplex transaction does constitute evidence of significant value. The court considers it likely that, in the hope of profiting from just such a transaction, a willing investor would have purchased the stock in September, 1990 for considerably more than $100,000. *Cf. U.S. v. Standard Milling Co. (In re Standard Milling Co.)*, 324 F.Supp. 386, 389 (N.D.Tex.1970) (holding that the price received in a subsequent sale has some probative force in asset valuation).

The court rejects the defendants' contention that Googel and Sisti received reasonably equivalent value for their interests in DSC and BSC because their release from the CBT debt was consideration for the stock. The Agreement, which was drafted by Steinberg's and Simons' attorney and which, by its own terms, was the complete agreement, stated that the consideration was $100,000 and mentioned no other. CBT agreed to release Googel and Sisti approximately five days after the transfer and consummation of the Agreement, and CBT's letter confirming an agreement to release makes no mention of either. Furthermore, CBT's letter was addressed to Simons and not copied to Googel and Sisti. If the release was consideration for the stock, Googel and Sisti would most likely have received direct confirmation of the agreement to release. The defendants provided no proof of such notice to Googel and Sisti. The fact that Shuch was also to be released from the CBT debt even though his interests in DSC and BSC were not transferred to Steinberg and Simons suggests that the release and the transfer were unrelated transactions.

The court acknowledges that Vitale testified that Shuch or Sisti had told him that Googel's and Sisti's release from the CBT debt was a condition of the transfer. However, this testimony is of uncertain significance, since Vitale did not amend the Agreement he had drafted to include the release and, when he called CBT to request the release, was told that the release had already been arranged. Googel's testimony that the CBT indebtedness was "insignificant in the scheme of things," that "[b]y September of 1990, 8.6 million dollars wasn't going to matter," and that the release provided no financial benefit simply reflects the reality of his and Sisti's financial condition. Thus, even if a part of the consideration for the transfer, the release from the CBT debt was of no meaningful value. The court concludes that under the circumstances of this proceeding, Googel's and Sisti's release from the CBT

---

an appropriate discount for the latter should focus on the size of the discount for restricted stock of a publicly held company when it is compared with unrestricted stock of the same class of the same publicly held company. After conducting such a study, one commentator has concluded that a 35% nonmarketability discount from intrinsic value is appropriate for stock in a closely held corporation."); James Edward Harris, *Valuation of Closely Held Partnerships and Corporations: Recent Developments Concerning Minority Interest and Lack of Marketability Discounts*, 42 Ark.L.Rev. 649, 659 (1989) ("The au-

thorities ... indicate that the illiquidity discount for closely held companies should, at the very least, be 35%. The market for restricted stock demands a discount of that much even though the purchasers of such shares can reasonably expect them to become publicly traded in the future, whereas, the purchaser of a closely held stock is theoretically worse off because no reasonable prospect of a public market exists. Accordingly, appraisal experts in many cases will determine that the discount for lack of marketability should be between 40% and 45%, and in some cases even more.").

debt does not enter into the determination of whether they received reasonably equivalent value.

## C.

### *MEASURE OF RECOVERY*

#### 1.

■ Section 550(a) and (b) of the Bankruptcy Code provide that:

(a) ... to the extent that a transfer is avoided under section ... 548 ... of this title, the trustee may recover, for the benefit of the estate, the property transferred, or, if the court so orders, the value of such property, from—

(1) the initial transferee of such transfer or the entity for whose benefit such transfer was made; or

(2) any immediate or mediate transferee of such initial transferee.

(b) The trustee may not recover under section (a)(2) of this section from—

(1) a transferee that takes for value, including satisfaction or securing of a present or antecedent debt, in good faith, and without knowledge of the voidability of the transfer avoided; or

(2) any immediate or mediate good faith transferee of such transferee.

11 U.S.C. §§ 550(a), (b).

■ "Section 550(a) is intended to restore the estate to the financial condition it would have enjoyed if the transfer had not occurred." *Hirsch v. Gersten (In re Centennial Textiles, Inc.,)* 220 B.R. 165, 176 (Bankr. S.D.N.Y.1998) (citations omitted). *See also Gill v. Maddalena (In re Maddalena),* 176 B.R. 551, 556–57 (Bankr.C.D.Cal.1995) (" [T]he object of any remedy should be, to the extent practicable, to 'undo' the transfer and to restore the parties to their pretransfer positions.... [T]he proper focus in [section 550(a) ] actions is not on what the transferee gained by the transaction, but rather on what the bankruptcy estate lost as a result of the transfer."). Where the property that was fraudulently transferred is unrecoverable, courts allow the trustee to recover the value of the property. *See Gennrich v. Montana Sport U.S.A., Ltd. (In re Int'l Ski*

*Serv., Inc.),* 119 B.R. 654, 658 (Bankr. W.D.Wis.1990). Section 550(á) "does not define 'value,' nor indicate at what time 'value' is to be determined." *Id.* at 658–69. Courts generally agree that the market value of the property at the time of transfer, less the consideration received, is the proper measure of recovery under § 550. *See, e.g., Kepler v. Sec. Pacific Hous. Servs. (In re McLaughlin),* 183 B.R. 171, 177 (Bankr.W.D.Wis.1995) (citing *Int'l Ski Serv.,* 119 B.R. at 659) ("The market price at the time of transfer is the proper measure of § 550 damages."); *Shape, Inc. v. Midwest Eng'g, Inc. (In re Shape, Inc.),* 176 B.R. 1, 3 (Bankr.D.Maine 1994) (allowing the trustee to recover the difference between the value of the property on the transfer date less the consideration received by the debtor); *James B. Downing & Co. v. Agri Dairy Prods., Inc. (In re James B. Downing & Co.),* 74 B.R. 906, 911 (Bankr. N.D.Ill.1987) ("The market price at the time of transfer is the proper measure of damages because that is what the debtor would have been able to get for its [property] had it not been improperly transferred.").

Although the trustee argues that the debtors' estate should recover the appreciated value of Googel's and Sisti's stock at the time of the Mediplex transaction, the three decisions the trustee relies upon to support such result are inapposite. The first two, *Rudin v. Steinbugler et al.,* 103 F.2d 323 (2d Cir. 1939), and *Nadel v. Fruitville Pike Assocs. (In re Burke),* 60 B.R. 665 (Bankr.D.Conn. 1986), address the recovery of rents and other proceeds earned from property fraudulently transferred, not recovery of the appreciated value of property transferred. In the third, *Cooper v. Ashley Communications NC, Inc. (In re Morris Communications NC, Inc.),* 75 B.R. 619 (Bankr.W.D.N.C.1987), *rev'd on other grounds,* 914 F.2d 458 (4th Cir.1990), the court ordered the initial transferee to return fraudulently transferred stock, which had dramatically increased in value after the transfer, because, under the facts in that proceeding, to do so was not inequitable and such an approach "avoids unnecessary contests over the meaning of the term 'value,' and thereby promotes judicial economy." *Id.* at 629. Ordering the return of the stock would be inequitable because the

initial transferees, Steinberg and Simons, transferred the stock to Mediplex, which, on the record made, purchased the stock for value, in good faith, and without knowledge that the transfer could be voided.

Measuring recovery by the market value of Googel's and Sisti's combined interests in DSC at the time of the transfer, $539,329, minus the total consideration they received for their interests in DSC, $100,000,[12] the court concludes that the trustee is entitled to recover a total of $439,329, one-half from Steinberg and one-half from Simons.[13]

2.

The trustee, in his complaint, seeks interest, costs, and attorneys' fees. Neither party's posttrial papers address when interest, if awarded, should commence. The Bankruptcy Code does not address the award of prejudgment interest in actions to avoid fraudulent transfers. In the absence of a statutory prohibition, a trial court may exercise its discretion to award prejudgment interest under federal law. See Blau v. Lehman, 368 U.S. 403, 414, 82 S.Ct. 451, 457, 7 L.Ed.2d 403 (1962) ("[Interest is not recovered according to a rigid theory of compensation for money withheld, but is given in response to considerations of fairness. It is denied when its exaction would be inequitable.]" (citation omitted)). The award of prejudgment interest should be a function of "(i) the need to fully compensate the wronged party for actual damages suffered, (ii) considerations of fairness and the relative equities of the award, (iii) the remedial purpose of the statute involved, and/or (iv) such other general principles as are deemed relevant by the court." Wickham Contracting Co., Inc. v. Local Union No. 3, Intern. Broth. of Elec. Workers, AFL—CIO, 955 F.2d 831, 833–34 (2d Cir.), cert. denied, 506 U.S. 946, 113 S.Ct. 394, 121 L.Ed.2d 302 (1992) (citations omitted). Courts generally justify awards of pre-

judgment interest in fraudulent transfer actions on the grounds that such awards permit the plaintiff to be made whole. See, e.g., P.A. Bergner & Co. v. Bank One, Milwaukee, N.A. (In re P.A. Bergner & Co.), 140 F.3d 1111, 1123 (7th Cir.1998) ("[P]rejudgment interest should not be thought of as a windfall in any event; it is simply an ingredient of full compensation that corrects judgments for the time value of money."). See also Turner v. Davis, Gillenwater & Lynch (In re Inv. Bankers, Inc.), 4 F.3d 1556, 1566 (10th Cir. 1993), cert. denied, 510 U.S. 1114, 114 S.Ct. 1061, 127 L.Ed.2d 381 (1994).

Bankruptcy courts have generally awarded prejudgment interest in fraudulent transfer actions from the time demand is made or an adversary proceeding initiated. See Inv. Bankers, 4 F.3d at 1566 (citations omitted). Some courts refuse to award prejudgment interest where the amount of the contested payment was unliquidated before judgment. See, e.g., O'Neal v. Southwest Missouri Bank of Carthage (In re Broadview Lumber Co., Inc.), 168 B.R. 941, 965 (Bankr.W.D.Mo. 1994), aff'd, 118 F.3d 1246 (8th Cir.). In the Second Circuit, however,

The speculative nature of the damages in question will always be relevant to a sound decision on a consideration of whether prejudgment interest should be awarded. However, the proper inquiry must include the other factors we have identified: analysis of the pertinent statute and its purposes; the need to fully compensate the injured party; fairness and the relative equities; and the specific circumstances of the parties and of the case. The degree of speculation must then be considered in light of these other factors to determine the propriety of prejudgment interest.

Wickham Contracting, 955 F.2d at 836.

The court concludes that an award of prejudgment interest from the date

---

**12.** Because Googel and Sisti received $100,000 consideration for their interests in both DSC and BSC, and the trustee has conceded that the interests in BSC were worthless, the court applies the entire $100,000 consideration to DSC.

**13.** The trustee, in his complaint, also seeks to recover from mediate transferees Barbara Simons, Sharon Simons, Harris Simons, and

Bruce Simons the value of their portions of the Mediplex transaction proceeds, pursuant to Bankruptcy Code § 550(a)(2). Because the court rejects the trustee's argument that recovery should be measured by the posttransfer appreciated value of the stock, the trustee is denied recovery from Barbara Simons, Sharon Simons, Harris Simons, and Bruce Simons.

of the complaint is warranted. The purpose of § 548 of the Bankruptcy Code is to preserve the assets of the estate. *See Bundles,* 856 F.2d at 824. Full compensation to the estate for the avoided transfer normally requires prejudgment interest to compensate for the value over time of the amount recovered. *See Gray v. Travelers Ins. Co. (In re Neponset),* 219 B.R. 918, 921 (Bankr.D.Mass. 1998); *Turner v. Davis, Gillenwater & Lynch (In re Inv. Bankers, Inc.),* 135 B.R. 659, 667 (Bankr.D.Colo.1991), *aff'd,* 161 B.R. 507 (D.Colo.1992), *aff'd,* 4 F.3d 1556 (10th Cir.1993), *cert. denied,* 510 U.S. 1114, 114 S.Ct. 1061, 127 L.Ed.2d 381 (1994). The court perceives no reason that an award of prejudgment interest in this proceeding is unfair or inequitable. Although the defendants did not know the exact extent of their liability until the court issued the judgment accompanying this ruling, "[w]hether a claim is disputed or not, either as to liability or as to amount, a judgment on the claim does not create liability; it merely recognizes and determines the prior existence of the liability." *Neponset,* 219 B.R. at 921. The existence of this liability should not be unexpected, given that Simons valued his 22.5% interest in DSC at $335,000 and his 17.5% interest in BSC at $105,000 in September 1990, three weeks after he and Steinberg had paid Googel and Sisti $100,000 for their combined 26.26% interests in DSC and 31.42% interests in BSC. *See Maddalena,* 176 B.R. at 557–58 (awarding prejudgment interest from the date the adversary proceeding was commenced because "[o]n that date, Defendant assumed the consequences associated with his failure to compensate the bankruptcy estate for its loss occasioned by the fraudulent conveyance...").

■■■ In this Circuit, the prejudgment interest rate is subject to the court's discretion. *See Sec. and Exchange Commission v. First Jersey Sec., Inc.,* 101 F.3d 1450, 1476 (2d Cir.1996), *cert. denied,* —— U.S. ——, 118 S.Ct. 57, 139 L.Ed.2d 21 (1997). The court exercises its discretion and grants the trustee prejudgment interest beginning on November 12, 1996, the day he filed the complaint, until the date of judgment, at the rate of 5.49%, the rate paid on 52–week U.S. Treasury Bills [14] when the complaint was filed, compounded annually.

The court denies the trustee's request for an award of attorneys' fees because he has provided no support for such an award in any of his posttrial briefs. The trustee's request for costs is granted.

### V.

### *CONCLUSION*

The court concludes that the trustee has proven that Googel's and Sisti's September, 1990 transfer to Steinberg and Simons of their DSC stock was constructively fraudulent pursuant to Bankruptcy Code § 548(a)(2) because Googel and Sisti were insolvent at the time of transfer, the market value of the stock at the time of transfer was $539,329, and the only consideration received was $100,000. The trustee is entitled to recover $439,329.

Judgment will enter against Steinberg in the amount of $219,665, plus interest on that amount from November 12, 1996 to this date at the rate of 5.49%, plus interest going forward at the rate of 5.271 percent as provided by law, plus one-half the trustee's costs. Judgment will enter against Simons in the amount of $219,665, plus interest on that amount from November 12, 1996 to this date at the rate of 5.49%, plus interest going forward at the rate of 5.271 percent as provided by law, plus one-half the trustee's costs.

---

**14.** *See* 28 U.S.C. § 1961.