In re **COLONIAL REALTY COMPANY, Jonathan Googel, Benjamin Sisti, Consolidated Debtors,**

**Hal M. Hirsch, As Trustee Of The Consolidated Estate Of Colonial Realty Company, Jonathan Googel and Benjamin Sisti, Plaintiff,**

v.

**Union Trust Company, Defendant.**

Bankruptcy No. 90–21980.
Adversary No. 93–6339.

United States Bankruptcy Court,
D. Connecticut.

Jan. 12, 1999.

---

**5.** Under certain circumstances, an interested participant at a judicial proceeding might be heard to assert that another party is "estopped" from backing out of a promise or stipulation reached with someone else, placed on the record in open court. But among the required circumstances would be that the party asserting estoppel has relied on that stipulation *to its own detriment. See Cukierman v. Mechanics Bank of Richmond (In re J.F. Hink & Son)*, 815 F.2d 1314, 1318 (9th Cir.1987); *In re Albion Disposal Inc.*, 203 B.R. 884 (Bankr.W.D.N.Y.1996), *aff'd in part on other grounds*, 217 B.R. 394 (W.D.N.Y. 1997). There is no such showing here.

**6.** Section 1225(a)(5)(B) of the Code provides:

with respect to each allowed secured claim provided for by the Plan—
(B)(i) the plan provides that the holder of such claim retain the lien securing such claim; and
(ii) the value, as of the effective date of the plan, of property to be distributed by the trustee or the debtor under the plan on account of such claim is not less than the allowed amount of such claim;

11 U.S.C. § 1225(a)(5)(b).

David M. Pollack, Eric H. Lindenman, and Hal Hirsch, Gainsburg & Hirsch, New York City, for plaintiff.

Marc S. Edrich, and Steven R. Smith, Pepe & Hazard, Hartford, CT, for defendant.

## MEMORANDUM OF DECISION

ROBERT L. KRECHEVSKY, Bankruptcy Judge.

### I. ISSUE

Hal M. Hirsch, as Trustee ("the Trustee") of the Consolidated Estates of Colonial Realty Company ("Colonial"), Jonathan Googel ("Googel") and Benjamin Sisti ("Sisti"), on July 12, 1993, filed a complaint against Union Trust Company ("the Bank"), seeking to avoid, as either preferential or fraudulent, the transfer of a $1,000,000 Certificate of Deposit ("the CD") from Colonial to the Bank. The Bank claims that the transfer was permissible under the Bankruptcy Code as an enforcement of its setoff rights in the CD.

A four day trial concluded on August 20, 1998, after which the parties filed extensive briefs. The primary factual dispute concerned whether, prior to the ninety day period preceding the filing of the bankruptcy petitions against the consolidated debtors, the Bank held setoff rights with regard to Colonial's account at the Bank that was utilized to fund the CD.

### II. BACKGROUND

Colonial, a Connecticut general partnership, was a nationwide syndicator of real estate limited partnerships, with Googel and Sisti as the original sole general partners. Colonial, which had extensive borrowing relationships with many banks, on or about June 21, 1989, entered into an unsecured revolving credit agreement with the Bank, a Connecticut banking corporation, to establish a credit line of $4,000,000 ("the first agreement").

By December, 1989, Colonial had drawn down the $4,000,000 credit line. A $2,000,000 repayment was due on March 23, 1990, and the entire $4,000,000 line was to be repaid by April 30, 1990. By the end of 1989, however, Colonial was experiencing considerable financial difficulty; the real estate market was in sharp decline and credit became tighter as regulators looked more critically at banks with large real estate loan portfolios. In December, 1989, Colonial defaulted on a sizeable loan, estimated at between $40,000,000 and $60,000,000, from Connecticut Bank & Trust; thereafter, a number of its other creditors also demanded repayment or additional collateral.

On January 17, 1990, Norman Alexander MacColl ("MacColl"), the Bank's lending officer handling the Colonial account, called upon Googel. Googel testified[1] that MacColl, concerned because of rumors in the banking community that Colonial was having financial problems, inquired about Colonial's ability to meet its upcoming repayment obligations under the first agreement. Googel advised MacColl that Colonial could make the $2,000,000 payment due March 23, 1990 only if the Bank would relend it that amount within a few days. He also stated that Colonial would likely not be able to pay down the full amount on April 30, 1990, and needed to have the Bank extend the loan.

Googel testified that MacColl responded by stating that, if the Bank were to continue extending Colonial's credit as requested, it would require Colonial to maintain a substantial bank account at the Bank, and he requested a $1,000,000 deposit. Googel agreed to the deposit, but only on the condition that the Bank not offset any Colonial loan against the deposit. Googel claims that MacColl agreed. On March 23, 1990, Colonial made the $2,000,000 loan payment then due. On March 26, 1990, the Bank reloaned the $2,000,000 to Colonial with repayment due April 30, 1990, or on demand.

On April 18, 1990, Colonial deposited $1,000,000 in its money market account at the Bank ("the Money Market Account"). Googel testified that the deposit was made pursuant to his oral agreement with MacColl; that the use of the money was essential to Colonial and it would not have made the deposit had it not been for MacColl's assurances that it would not be set off. As anticipated, on April 30, 1990, Colonial was unable to make the payment then due and defaulted

---

1. Googel testified by videotape, due to his present incarceration in a federal prison. He pled guilty in 1993 to various counts of wire fraud, bank fraud, and impeding the administration of Internal Revenue Service laws. Googel and Sisti did not receive discharges from debt in their individual bankruptcy cases.

on the loan. The Bank then put an administrative hold on the Money Market Account, "freezing" the funds. Concerned that Colonial could not access the Money Market Account, Googel, in May, 1990, requested a meeting with the Bank to discuss the "freeze." MacColl and Hunt Coracci ("Coracci"), MacColl's immediate supervisor, attended the meeting. Googel objected to the Bank not honoring MacColl's promise that the Bank would not freeze or setoff the $1,000,000. MacColl denied making such a promise and walked out of the meeting. Shortly thereafter, the meeting ended, with Coracci agreeing to review the matter. On July 5, 1990, the Bank and Colonial signed a new revolving credit agreement for $4,000,-000 ("the second agreement"), which required Colonial to grant the Bank a security interest in a $1,000,000 Certificate of Deposit ("the CD") to be purchased from the Bank with funds from the Money Market Account. The security agreement was signed the following day and the Bank purported to perfect its security interest by filing a financing statement and taking possession of the CD.

On September 14, 1990, creditors filed involuntary chapter 7 petitions simultaneously against Colonial, Googel, and Sisti. That same day, the Bank cashed the CD and applied the $1,016,073.61 proceeds as a setoff against the $4,058,189.73 owed it under the second agreement. As a result of Colonial's collapse, thousands of investors and creditors lost billions of dollars. *FDIC v. Hirsch (In re Colonial Realty Co.)*, 980 F.2d 125, 127 (2d Cir.1992) ("Thousands of Colonial investors suffered significant losses in connection with the Colonial collapse, and claims filed by all creditors total billions of dollars. Shortly after the fall of Colonial, many of the banks that had loaned money to the Debtors and the limited partnerships also failed.")

MacColl denied promising that, if Colonial made a $1,000,000 deposit, the Bank would not freeze or setoff the deposit. He testified that he had frequently requested that Colonial maintain "compensating balances" with the Bank, but he denied promising to waive the Bank's setoff rights with regard to any such deposits and stated that he had "no idea" why Colonial made the uncharacteristic $1,000,000 deposit in April, 1990. MacColl also testified that he was unaware that Colonial was experiencing financial difficulties until sometime in April, 1990, although he acknowledged that, in early 1990, the Bank had orally agreed to modify the first agreement's "clean-up" provision because Colonial was unable to satisfy the requirement that it be debt-free for a thirty day period before April 30, 1990. MacColl also claimed that Colonial's need to reborrow $2,000,000 within days of making its $2,000,000 payment in March, 1990 was not a cause for concern; he testified that there was nothing unusual about such an arrangement; that "[i]t happens every day."

## III. CONTENTIONS OF THE PARTIES

While both parties acknowledge that the second agreement, signed within the ninety day prepetition "lookback" period, provided for the Bank to have setoff rights and a security interest in the CD, they disagree as to whether the Bank had setoff rights in the Money Market Account prior to the second agreement.

Claiming that MacColl had, in his January, 1990 discussions with Googel, waived the Bank's setoff rights with respect to the $1,000,000 deposit made by Colonial on April 18, 1990, the Trustee contends that the granting of a security interest in the CD under the second agreement replaced an unsecured loan with a secured loan, and is, therefore, avoidable as a preference under Bankruptcy Code § 547(b). Alternatively, the Trustee seeks to avoid the security interest as a fraudulent transfer under § 548(a)(1), claiming that Colonial acted with actual intent to hinder, delay or defraud its other creditors in giving the Bank security interest.

The Bank argues that it never waived its setoff rights; that it became entitled to the funds in Colonial's accounts at the Bank when Colonial defaulted on April 30, 1990. Claiming that obtaining the security interest did not improve its position, but was merely a way of safeguarding its pre-existing rights, the Bank contends that it did not receive a preference. The Bank argues that it obtained the proceeds of the CD by enforcing

its setoff rights as permitted under § 553. In addition, the Bank claims that the Trustee's action is barred by the statute of limitations and that any evidence of MacColl's oral agreement should be excluded under the parol evidence rule and/or the statute of frauds.

## IV. PROCEDURAL ISSUES

### A. Statute of Limitations

■ Bankruptcy Code § 546(a) imposes a two year statute of limitations on avoidance actions under the Code. The Bank claims that this proceeding was not timely filed because such two-year period should have begun to run from either September 14, 1990, the date Colonial began serving as debtor in possession or from May 24, 1991, the date Hirsch was appointed interim trustee. The court has determined in an earlier proceeding within this consolidated case that "October 17, 1991, the date Hirsch became permanent trustee of the consolidated estate ... is the relevant date for the purpose of determining whether the avoidance actions in this adversary proceeding were timely filed under § 546(a) ...." and that the applicable two year statute of limitations period began to run October 18, 1991, one day later. *Hirsch v. Harper (In re Colonial Realty Co.)*, 168 B.R. 512, 519 (Bankr.D.Conn.1994). The Bank argues that the court should reconsider its position in light of the Ninth Circuit's decision in *Mosier v. Kroger Co. (In re IRFM, Inc.)*, 65 F.3d 778 (9th Cir.1995). The court is not persuaded by the reasoning of the Ninth Circuit in that case, having previously considered and rejected similar arguments in *Hirsch v. Harper*.

### B. Parol Evidence Rule

■ The Bank next claims that the parol evidence rule excludes receipt of evidence of any oral promise by MacColl. The Trustee claims that MacColl's January, 1990 statements modified the Bank's setoff rights under the first agreement, signed on June 21, 1989. Because the parol evidence rule concerns only the effect on a later written agreement of oral statements made prior to the writing, it is inapposite to the facts of this proceeding. *Damora v. Christ–Janer*, 184 Conn. 109, 113, 441 A.2d 61 (1981) ("if a written contract is found to be the final repository of agreements made between the parties, evidence of a *prior* unwritten agreement would not be allowed...."
) (emphasis added). The Bank's claim that the second agreement was a "restructuring" of the first agreement, rather than a new loan, is not convincing. Additionally, this claim is not supported by the terms of the agreement drafted by the Bank, which provides that it "shall have a term which commences on the date hereof," July 5, 1990.

### C. Statute of Frauds

■ The Bank also argues that under the Statute of Frauds, Conn.Gen.Stat.Ann. § 52–550 (West Supp.1998)[2], the terms of the first agreement may only be modified in writing. Although the Bank correctly asserts that where the original agreement falls within the statute, any subsequent modification is also covered, the Connecticut courts have recognized certain exceptions to the requirement of a writing. "If an agreement falls within the statute of frauds there are certain conditions which must be met before oral testimony will be allowed in as to the agreement. There must be preliminary proof establishing that there was some agreement in pursuance of which [one party] has acted in part performance before the court will accept oral testimony as to what the nature and terms of that agreement were. This preliminary evidence generally is that of conduct. Under the rule well estab-

---

**2.** § 52–550. Statute of frauds; written agreement or memorandum (a) No civil action may be maintained in the following cases unless the agreement, or a memorandum of the agreement, is made in writing and signed by the party, or the agent of the party, to be charged: (1) Upon any agreement to charge any executor or administrator, upon a special premise to answer damages out of his own property; (2) against any person upon any special promise to answer for the debt, default or miscarriage of another; (3) upon any agreement made upon consideration of marriage; (4) upon any agreement for the sale of real property or any interest in or concerning real property; (5) upon any agreement that is not to be performed within one year from the making thereof; or (6) upon any agreement for a loan in an amount which exceeds fifty thousand dollars.

Conn.Gen.Stat.Ann. § 52–550 (West Supp.1998).

lished by the authorities, it must appear that these acts are of such a character that they can be reasonably and naturally accounted for in no other way than that they were performed in pursuance of a contract between the parties, and though they cannot indicate all the terms of the agreement, they must be in conformity with its provisions. Whenever acts of part performance are made out which thus point to a contract, the door is opened, and the plaintiff may introduce additional parol evidence directed immediately to the terms of the contract relied upon." *Greene v. Scott,* 3 Conn.App. 34, 37, 484 A.2d 474 (1984) (citations and quotation marks omitted).

Since the court concludes that the Trustee's claim that Colonial made the $1,000,000 deposit in reliance on MacColl's alleged promise cannot be reasonably explained in any other way, *see infra* part V, it is evidence of the kind of part performance that removes the requirement that a modification to the first agreement be in writing.

## V. DISCUSSION

The Trustee asserts that Colonial's transfer to the Bank of a security interest in the CD pursuant to the terms of the second agreement is avoidable as a preference under § 547(b). The Bank claims that it obtained the proceeds of the CD by its setoff rights in accordance with § 553. "The Trustee's right to avoid a transfer must be tested against any right of Union Trust to a pre-petition setoff. If that right is established, the court does not reach § 547 but makes its decision solely under § 553." *Belford v. Union Trust Co. (In re Wild Bills, Inc.),* 206 B.R. 8, 12 (Bankr.D.Conn.1997) (citations omitted). The court, therefore, will first consider the Bank's claim that it obtained the proceeds of the CD pursuant to the valid exercise of its setoff rights under § 553. If any portion of the setoff is determined to be recoverable by the Trustee under § 553, the court will consider whether the Bank may nevertheless be entitled to retain it pursuant to a valid secu-

rity interest or whether any such security interest is avoidable by the Trustee under § 547(b).

### A. Setoff Rights Prior to Second Agreement

■ Whether the transfer of a security interest in the CD is a preference and the extent to which the Bank possessed setoff rights under § 553 depend upon whether the Bank held setoff rights in the Money Market Account prior to the ninety day prepetition "look-back" period. Googel and MacColl presented conflicting testimony as to whether MacColl had promised, in return for a $1,000,000 deposit from Colonial, that the Bank would not enforce any setoff rights against the deposit. The court concludes that MacColl did make such a promise, and that, prior to the granting of setoff rights and a security interest under the second agreement on July 5, 1990, within the ninety day prepetition period, the Bank had no enforceable setoff rights against the proceeds of the $1,000,000 deposit in the Money Market Account.

Both Colonial and the Bank sought to refinance the $4,000,000 loan. Upon its refinancing, however, the loan would no longer be in default and the Bank would no longer have the right it claims to have had to setoff the $1,000,000 in the account or impose its administrative hold in anticipation of exercising its setoff rights. Without the security agreement, Colonial would have been free to withdraw the funds. The security agreement enabled the Bank to provide the refinancing without losing the right it claims it already had to setoff the $1,000,000. The security interest obtained by the Bank under the second agreement, therefore, was an integral part of the refinancing arrangement, even though the Bank claims that it actually enforced its setoff rights rather than its security interest in the CD.

■ In order to show an avoidable preference, the Trustee has the burden of proving each element of § 547(b)[3] by a preponder-

---

**3.** § 547. Preferences

 (b) Except as provided in subsection (c) of this section, the trustee may avoid any transfer of an interest of the debtor in property—

 (1) to or for the benefit of a creditor;
 (2) for or on account of an antecedent debt owed by the debtor before such transfer was made;

ance of the evidence. *See* § 547(g) ("... the trustee has the burden of proving the avoidability of a transfer under subsection (b) of this section...."); *Belford v. Cantavero (In re Bassett)*, 221 B.R. 49, 52 (Bankr.D.Conn. 1998) (preponderance of the evidence standard). Here, the parties do not dispute that in the second agreement, Colonial gave a security interest (1) to a creditor; (2) on account of an antecedent debt; (3) while the debtor was insolvent; and (4) within ninety days prior to the filing of the bankruptcy petition. The dispute concerns whether the fifth requirement of § 547(b), that the transfer would entitle the Bank to receive more under a chapter 7 distribution than it would be entitled to receive had the transfer not occurred, was satisfied.

The only direct evidence offered by the Trustee that MacColl promised that the Bank would not enforce its setoff rights with respect to the $1,000,000 deposit was Googel's testimony, which was denied by Mac-Coll. Although the Bank strongly challenges the testimony of Googel as a convicted felon, the circumstances lend sufficient support to Googel's claim to make it more likely than not that MacColl did make the alleged promise. The court finds that the Trustee has met its burden of proving by a preponderance of the evidence that MacColl, on behalf of the Bank, orally agreed that, if Colonial deposited $1,000,000, the Bank would not enforce its setoff rights against the deposit.

MacColl claimed he was unaware of Colonial's financial difficulties until April, 1990. However, he also testified that he regularly reviewed local and national periodicals as well as trade publications. When Connecticut Bank and Trust called in Colonial's $40,000,000 to $60,000,000 line of credit in December, 1989, word spread rapidly among the banking community, causing several other large creditors—including Citibank, Ma-

rine Midland, Connecticut National Bank and Merrill Lynch—to demand repayment as well. Although MacColl claimed that his January 17, 1990 meeting with Googel was of a routine nature and that he had no reason to be concerned about Colonial's financial situation, Googel's testimony that MacColl's January 17, 1990 meeting was prompted by concern over these rumors is more plausible, particularly since MacColl, in a letter only a few weeks earlier, indicated his intent not to meet with Colonial until March.

Googel's testimony that there was an oral agreement waiving setoff rights is consistent with the evidence offered that the Bank and Colonial had oral agreements regarding at least two other aspects of the line of credit. MacColl acknowledged that the Bank had orally agreed to modify the "clean-up" provision of the first agreement by allowing Colonial to postpone the required 30-day debt-free period. In addition, Googel claimed that Colonial made the $2,000,000 payment due on March 23, 1990 only because MacColl had promised that the Bank would promptly relend it. The evidence that the Bank did relend the $2,000,000 only three days after the payment supports Googel's claim.

The Bank's claim that it sought the additional deposit as a compensating balance is inconsistent with the timing and amount of the deposit. Compensating balances are generally deposits with a lending bank that earn interest at a rate below that being charged on the loan; their purpose is to increase the net profit to the bank. Coracci testified that compensating balances are usually sought at the inception of the loan, since their purpose is to augment the effective yield; he also testified that, although the amounts so requested can vary, many banks use 10% of the loan amount as a guideline. The $1,000,000 was considerably larger than would be suggested by the 10% guideline. In addition, since it was not deposited until

(3) made while the debtor was insolvent;

(4) made—

(A) on or within 90 days before the date of the filing of the petition; or

(B) between ninety days and one year before the date of the filing of the petition, if such creditor at the time of such transfer was an insider; and

(5) that enables such creditor to receive more than such creditor would receive if—

(A) the case were a case under chapter 7 of this title;

(B) the transfer had not been made; and

(C) such creditor received payment of such debt to the extent provided by the provisions of this title.

11 U.S.C.A. § 547(b).

April 18, 1990, it is unlikely that the interest differential over such a short time period would be a significant consideration.

Finally, Googel's claim that MacColl promised that the Bank would not enforce its setoff rights provides the most plausible explanation for Colonial's deposit. Googel testified that Colonial's cash flow was very tight and that it was essential that they have access to the $1,000,000. Colonial knew that it would be unable to make the required $4,000,000 loan payment on April 30, 1990, just twelve days later. Because, in the absence of a waiver, the Bank would have setoff rights, Googel's claim that Colonial would not have made the deposit without a promise to waive those rights is credible.

The Trustee maintains that the Bank was willing to waive its setoff rights in order to obtain the deposit it would otherwise not have received. At that time, the Bank was involved in merger negotiations, and, as the Trustee's expert witness on bank practices testified, refinancing Colonial's credit line would have benefitted the Bank as well as Colonial by permitting the Bank to show Colonial's $4,000,000 loan as current, rather than in default.

The court thus concludes that the Trustee has met its burden of proof in establishing that, in return for Colonial's $1,000,000 deposit to the Money Market Account, MacColl had agreed that the Bank would not freeze or offset such amount.

### B. Section 553—Setoff Limitation

■ The Bank claims to have obtained the proceeds of the CD by enforcing its setoff rights. In asserting the right to setoff, the Bank bears the burden of establishing that right. *Belford v. Union Trust Co.*, 206 B.R. at 13. The Bank has established that the second agreement granted it setoff rights against all of Colonial's accounts then held by it.

■ However, "[t]he right of a creditor to a setoff is not absolute under bankruptcy law where a Trustee's duty to maximize the assets of a bankruptcy estate must be balanced against the equitable treatment of creditors. The improvement in position test of § 553(b)(1)[4] is intended to strike that balance by preventing the creditor from using a setoff to put itself in a better position than it was in prior to the ninety day prepetition period." *Id.* at 14 (citations and quotation marks omitted). The test compares the insufficiency, the amount by which the loan exceeds the funds on deposit, on the setoff date, September 14, 1990, with the comparable amount as of the date ninety days prior to the filing of the bankruptcy petition, June 16, 1990. Any decrease in insufficiency may be recovered by the Trustee. In order to apply the test, the court must determine the extent of the Bank's setoff rights as of June 16, 1990, which was prior to the explicit grant of setoff rights under the second agreement.

■ Section 553(a)[5] preserves the setoff rights under applicable nonbankruptcy law. "Connecticut law, like law generally, treats a deposit in a bank as a promise to pay from the bank to the depositor. If the depositor is also indebted to the bank, such debts of the depositor and the bank are

---

4. § 553. Setoff

(b)(1) Except with respect to a setoff of a kind described in section 362(b)(6), 362(b)(7), 362(b)(14), 365(h), 546(h), or 365(i)(2) of this title, if a creditor offsets a mutual debt owing to the debtor against a claim against the debtor on or within 90 days before the date of the filing of the petition, then the trustee may recover from such creditor the amount so offset to the extent that any insufficiency on the date of such setoff is less than the insufficiency on the later of—

(A) 90 days before the date of the filing of the petition; and

(B) the first date during the 90 days immediately preceding the date of the filing of the petition on which there is an insufficiency.

(2) In this subsection, "insufficiency" means amount, if any, by which a claim against the debtor exceeds a mutual debt owing to the debtor by the holder of such claim.

11 U.S.C.A. § 553(b).

5. § 553. Setoff

(a) Except as otherwise provided in this section and in sections 362 and 363 of this title, this title does not affect any right of a creditor to offset a mutual debt owing by such creditor to the debtor that arose before the commencement of the case under this title against a claim of such creditor against the debtor that arose before the commencement of the case, except to the extent that—

(1) the claim of such creditor against the debtor is disallowed;

(2) such claim was transferred, by an entity other than the debtor, to such creditor—

(A) after the commencement of the case; or

mutual, and the bank may set off a past due debt with deposits held by the bank, *provided there is no express agreement to the contrary* and the deposit is not specifically applicable to some other particular purpose." *Hirsch v. Union Trust Co. (In re Colonial Realty Co.),* 208 B.R. 616, 618 (Bankr. D.Conn.1997) (citing *Southington Savings Bank v. Rodgers,* 40 Conn.App. 23, 29, 668 A.2d 733 (1995), cert. denied, 236 Conn. 908, 670 A.2d 1307 (1996); *Vic Gerard Golf Cars, Inc. v. Citizen's National Bank of Fairfield,* 528 F.Supp. 237, 241 (D.Conn.1981)) (emphasis added). Because the court has found that MacColl agreed that the Bank would not enforce its setoff rights, under the state law doctrines of waiver and estoppel, those rights were not enforceable. On June 16, 1990, the amount in Colonial's accounts subject to setoff by the Bank did not include the proceeds of the $1,000,000 deposit.

On the basis of the exhibits submitted at trial, the court has estimated the loan and account balances on June 16, 1990 and September 14, 1990. Because the Bank had no enforceable right to setoff against the $1,000,000 deposit prior to the adoption of the second agreement on July 5, 1990, the account balances prior to that date are reduced by the deposit and the accrued interest thereon.

| | June 16, 1990 | Sept. 14, 1990 |
|---|---|---|
| Loan Amount: | | |
| Principal | $ 4,000,000.00 | $ 4,000,000.00 |
| Unpaid Accrued Interest | 17,833.32 | 53,750.00 |
| Total | $ 4,017,833.32 | $ 4,053,750.00 |
| Accounts: | | |
| Checking | $ 239.92 | $ 239.92 |
| Money Market | 1,129,027.74 | 161.75 |
| less deposit with interest @6% | (1,010,000.00) | N/A |
| CD | 0.00 | 1,016,073.61 |
| Total | $ 119,267.66 | $ 1,016,475.28 |
| "Insufficiency" | $ 3,898,565.66 | $ 3,037,274.72 |
| Decrease in Insufficiency | $ 861,290.94 | |

The $ 861,290.94 decrease in insufficiency is recoverable by the Trustee.

## C. Section 547(b)—Avoidable Preferences

Having determined that the Trustee is entitled to recover $861,290.94 of the amount set off by the Bank under § 553(a), the court must determine whether the Bank held a valid security interest in the CD which would entitle it to retain the proceeds. The Trustee does not contest that the Bank obtained a security interest in the CD pursuant to the terms of the second agreement, but contends that the grant of the security interest was an avoidable preference under § 547(b).

The Bank contends that it received no greater rights under the second agreement than it had prior to it because § 506(a) [6] provides that the holder of setoff rights has a secured claim to the extent of those rights. However, because the court has determined that the Bank did not have a valid right of setoff against the $1,000,000 deposit prior to July 5, 1990, the security agreement signed pursuant to the second agreement elevated the Bank's claim from unsecured to partially secured, enabling the Bank to receive more under a chapter 7 distribution than it would have been entitled to, had the transfer had not occurred.

Since all of the requirements of § 547(b) have been satisfied, the security interest granted to the Bank pursuant to the second agreement is avoided and, pursuant to

(B)(i) after 90 days before the date of the filing of the petition; and
(ii) while the debtor was insolvent; or
(3) the debt owed to the debtor by such creditor was incurred by such creditor—
(A) after 90 days before the date of the filing of the petition;
(B) while the debtor was insolvent; and
(C) for the purpose of obtaining a right of setoff against the debtor.
11 U.S.C.A. § 553(a).

**6.** Section 506 provides, in relevant part:

§ 506 Determination of secured status
(a) An allowed claim of a creditor secured by a lien on property in which the estate has an interest, or that is subject to setoff under section 553 of this title, is a secured claim ... to the extent of the amount subject to setoff ... and is an unsecured claim to the extent that ... the amount so subject to setoff is less than the amount of such allowed claim.
11 U.S.C.A. § 506(a).

§ 550(a) [7], recoverable by the Trustee.

D. Section 548(a)(1)—Fraudulent Transfer

Because the court has determined that the security interest in the CD is avoidable under § 547 as a preference, it need not consider whether the security interest is avoidable as a fraudulent transfer under § 548(a)(1).

E. Fees, Interest and Costs

The Trustee's amended complaint seeks fees, interest and costs, and his post-trial reply brief requests "interest from the July 12, 1993 commencement date of this proceeding." (Post–Trial Reply Brief at 17.) The Bank objects to prejudgment interest "given its good faith defense of this action and the court's discretion." (Bank's Reply Brief at 22.) The Bank cites *In re First Software Corp.*, 107 B.R. 417, 426 (D.Mass. 1989), as support. An award of prejudgment interest is an exercise of the trial court's discretion. For reasons comparable to those recently stated in *Hirsch v. Steinberg (In re Colonial Realty Co.)* 226 B.R. 513, 526 (Bankr.D.Conn.1998) ("[P]rejudgment interest ... is simply an ingredient of full compensation that corrects judgments for the time value of money.") (citations and quotation marks omitted), the court exercises its discretion and grants the Trustee prejudgment interest beginning on July 12, 1993, the day he filed the complaint, until the date of judgment, at the rate of 3.54%, the rate paid on 52-week U.S. Treasury Bills when the complaint was filed, compounded annually.

The Trustee presents no basis for an award of attorney's fees and such request is denied. The request for costs is granted.

## VI. CONCLUSION

The court concludes that the Trustee is entitled to recover $861,290.94 from the Bank pursuant to the setoff limitation of § 553(b)(1), and that the security interest given to the Bank pursuant to the second agreement is avoided as a preference under § 547(b), leaving the Bank's claim unsecured.

Judgment will enter against the Bank in the amount of $861,290.94, plus interest from July 12, 1993, the date of commencement of this proceeding, to this date at the rate of 3.54%, plus interest going forward at the rate of 4.545%, plus costs.

## JUDGMENT

This action came on for trial before the Court, Honorable Robert L. Krechevsky, U.S. Bankruptcy Judge, presiding, and the issues having been duly tried, and the Court having issued a memorandum of even date, it is

**ORDERED, ADJUDGED AND DECREED** that the Bank's security interest in Colonial's Certificate of Deposit and its proceeds is hereby avoided; and that the Plaintiff, Hal M. Hirsch, Trustee of the consolidated estates of Colonial Realty Company, Jonathan Googel, and Benjamin Sisti, recover of the Defendant, Union Trust Company, the sum of $861,290.94, plus interest on that amount from July 12, 1993 to this date at the rate of 3.54%, plus interest going forward at the rate of 4.545% as provided by law, plus the costs of action.

---

7. Section 550(a) provides, in relevant part, that when a transfer is avoided, the Trustee may recover the property transferred or the value of such property.